975 So.2d 306 (2007)
Ronald W. COTTRELL and Ivy Williams
v.
NATIONAL COLLEGIATE ATHLETIC ASSOCIATION et al.
Tom Culpepper
v.
Ronald W. Cottrell.
No. 1041858, 1050436, and 1050437.
Supreme Court of Alabama.
June 1, 2007.
*314 Thomas T. Gallion III of Haskell, Slaughter, Young & Gallion, LLC, Montgomery; J. Michael Rediker, Charles M. Elmer, and Michael C. Skotnicki of Haskell, Slaughter, Young & Rediker, LLC, Birmingham; and C. Delaine Mountain of Mountain & Baird, Tuscaloosa, for appellant/cross-appellee Ronald W. Cottrell and appellant Ivy Williams,
James J. Jenkins and A. Courtney Crowder of Phelps, Jenkins, Gibson & Fowler, L.L.P., Tuscaloosa; and Robert H. Rutherford and John C. Morrow of Burr & Forman, LLP, Birmingham, for appellees National Collegiate Athletic Association, Thomas Yeager, and Richard Johanningmeier.
John P. Scott and Joshua H. Threadcraft of Starnes & Atchison, LLP, Birmingham, for appellee/cross-appellant Tom Culpepper.
STUART, Justice.
Ronald W. ("Ronnie") Cottrell and Ivy Williams sued the National Collegiate Athletic Association ("the NCAA"), Tom Culpepper, and others alleging defamation, false-light invasion of privacy, negligence, wantonness, and civil conspiracy. The only claim that was presented to the jury was Cottrell's defamation claim against Culpepper. The jury returned a verdict for Cottrell in the amount of $6 million in compensatory damages and $24 million in punitive damages. Culpepper then filed a renewed motion for a judgment as a matter of law and a motion for a new trial. The trial court granted Culpepper's motion for a new trial. Cottrell and Williams appeal; Culpepper cross-appeals.

Facts
Cottrell and Williams are former assistant football coaches at The University of *315 Alabama ("The University"). The University is a member of the NCAA; a nonprofit, unincorporated association whose members include "virtually all public and private universities and 4-year colleges conducting major athletic programs in the United States." NCAA v. Tarkanian, 488 U.S. 179, 183, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988). The NCAA is governed by its member institutions, and one of its main goals is
"`to maintain intercollegiate athletics as an integral part of the educational program and the athlete as an integral part of the student body, and by so doing, retain a clear line of demarcation between college athletics and professional sports.'"
488 U.S. at 183, 109 S.Ct. 454. The bylaws of the NCAA provide rules for the operation of a member institution's athletic programs, including recruitment and eligibility of prospective student-athletes and student-athletes, the salaries and the benefits of coaches and athletic staff, and the conduct and level of interaction between alumni and "athletic representatives" (better known as "boosters") of a member institution, on the one hand, and prospective student-athletes and enrolled student-athletes, on the other. As a member of the NCAA, the institution and its employees, student-athletes, alumni, and athletic representatives agree to comply with the NCAA rules and to submit to the NCAA's rule-enforcement process. If the NCAA investigates an alleged rule violation by a member institution, the member institution and its employees, student-athletes, alumni, and athletic representatives are required by NCAA rules to cooperate fully with the investigation into and the resolution of the alleged rule violation. Gene Marsh, the faculty athletic representative at The University from 1996 to 2003, explained the role of the institution and its representatives in the NCAA investigative process, stating: "[F]ull cooperation [with the NCAA rule-enforcement process] is not a strategy, but a duty if [an institution] chooses to remain a member of the NCAA."
The NCAA has two groups that are responsible for resolving an alleged rule violation committed by an institution. The enforcement staff[1] investigates the alleged rule violation, charges a member institution with a specific rule violation, and essentially prosecutes the case before the committee on infractions ("COI").[2] The COI conducts a hearing to adjudicate the charge, and it imposes a penalty if it finds that a rule violation occurred.
When an alleged rule violation is reported to the NCAA, the enforcement staff investigates. Initially, the enforcement staff sends an investigator to the member institution to determine if the alleged rule violation can be substantiated. The investigator interviews the individual who has alleged the rule violation and any other persons who may have knowledge of the alleged rule violation. The investigator then reports his or her discoveries, which may support charges of additional rule violations by the member institution, to the enforcement staff, which determines whether the information adequately establishes that the member institution has violated a NCAA rule or rules. If the enforcement staff believes that the findings of the investigator support a charge of a rule violation or violations by the member *316 institution, the enforcement staff sends a letter of preliminary inquiry to the member institution. This letter notifies the member institution that a preliminary investigation of alleged rule violation will be conducted. This phase of the rule-enforcement process involves extensive interviewing by the enforcement-staff investigator of employees of the institution, student-athletes, and any other individuals who may have knowledge of the alleged rule violation. If this inquiry indicates that the allegations may be meritorious, a letter of official inquiry ("LOI") issues to the member institution, detailing the facts surrounding the alleged rule violation and the specific rule or rules the enforcement staff believes the institution, its staff, alumni and/or athletic representatives have violated. A LOI may also be sent to various employees or athletic representatives of the institution who are alleged to have involvement in the rule violation. The institution and other recipients of a LOI file a response with the NCAA, explaining their positions on each alleged rule violation.
After the recipients of the LOIs have responded, the enforcement staff meets with them. This conference provides an opportunity for all parties to explain their positions on each violation. If the enforcement staff determines that a party's response adequately establishes that an alleged rule violation did not occur or that there is insufficient evidence to pursue the alleged rule violation, the enforcement staff can dismiss the charge. After the conference, the enforcement staff prepares a case summary, which sets forth the charged rule violation and the positions of the enforcement staff, the institution, and other recipients of LOIs with regard to each charged rule violation. The case summary is then submitted to the COI in preparation for the hearing. Essentially, this case summary details the alleged rule violation the enforcement staff charges against the member institution, its staff, and/or its athletic representatives.
The COI conducts a hearing at which all parties present their positions. Opening statements are made by each party. The enforcement staff then presents each charge and its evidence. The institution and any affected employee, staff member, or representative of the institution then presents evidence as to why the charge lacks merit. Members of the COI ask questions of the parties involved at the hearing to develop the evidence. After each charge is fully addressed, each party presents a closing argument to the COI. The COI adjourns the hearing, deliberates, and returns with findings of fact with regard to each charged rule violation and a determination of the penalty to be imposed.
NCAA rules require that the investigation of alleged rule violations by the enforcement staff and the proceedings of the COI be conducted with confidentiality. The NCAA investigator, the member institution, and others involved in the investigation are required to maintain confidentiality throughout the entire process. Bylaw 32.1.4 of the NCAA Division I Manual, provides:
"The cooperative principle imposes an affirmative obligation on each member institution to assist the NCAA enforcement staff in developing full information to determine whether a possible violation of NCAA legislation has occurred and the details thereof. An important element of the cooperative principle requires that all individuals who are subject to NCAA rules protect the integrity of an investigation. A failure to do so may be a violation of the principles of ethical conduct. The NCAA enforcement staff will usually share information *317 with the institution during any investigation; however, it is understood the staff, to protect the integrity of the investigation, may not in all instances be able to share information with the institution."
(Emphasis added.)
When the COI issues its findings of fact and penalty determinations, it announces the decision via a press release and a published "Infractions Report." The press release and the report identify the member institution, but do not include the names of any staff members or athletic representatives who have been found to have violated a rule. The release and report may, however, refer to an individual by his or her position, such as "recruiting coordinator." The ruling of the COI may be appealed by any party to an appeals committee. The decision of the appeals committee is final.
The evidence submitted at trial indicated that The University had been investigated by the NCAA, charged with rule violations, and penalized on two prior occasions before 2000. In 1995, the NCAA had investigated allegations that a prospective student-athlete had received money in exchange for signing a scholarship to play football at The University and that after the student-athlete enrolled at The University he had received special treatment in securing a loan from a bank at which an athletic representative was an officer. The NCAA investigation did not substantiate the allegation that the prospective student-athlete had received money during his recruitment. The investigation did reveal that the enrolled student-athlete had secured loans to pay for disability insurance without making proper arrangements with The University.
During the 1995 investigation, the NCAA also focused on an allegation that The University had allowed a student-athlete to participate in football practices and games after he had signed a contract with a sports agent to represent him. NCAA rules provide that a student-athlete is ineligible to participate in collegiate athletics if the student-athlete has indicated, by signing a contract with a sports agent, that he wants to pursue a career in professional sports. The contract between the student-athlete and the agent was written on a napkin and stated that the agent agreed to represent the student-athlete for $400. The investigation revealed that the student-athlete had informed The University that he had signed up to be drafted to play professional football but had removed his name from the list of potential draftees and had taken no additional steps toward a professional football career. The student-athlete, however, did not inform The University that he had signed a contract with an agent.
The NCAA concluded as a result of the 1995 investigation that The University had violated NCAA rules with regard to the student-athlete's securing the loan and by allowing a student-athlete who had entered into a contract with a sports agent to participate in football practices and to play in college football games. The NCAA found that The University's athletic department's compliance office, i.e., the office responsible for ensuring compliance with the NCAA rules, was not well organized and should have been more diligent in informing student-athletes about how to secure loans without violating NCAA rules. Additionally, the NCAA criticized The University for failing to conduct a more thorough in-house investigation of the circumstances surrounding the student-athlete's signing with an agent and for failing to. self-enforce NCAA rules. The University recognized that it had violated NCAA rules, and it self-imposed penalties, including the disassociation of the two athletic representatives involved in the *318 loans and a reduction in the number of potential scholarships in its football program by four for one year. The COI, however, increased the penalties to include public reprimand and censure, a three-year probationary period, a one-year loss of participation in postseason competition by the football team, and the loss of an additional 22 scholarships for prospective student-athletes in football.
Newspaper and Internet articles admitted into evidence establish that the public was outraged by the harshness of the penalties and voiced its lack of understanding as to why the NCAA chose to impose such stiff penalties on The University. The discussion indicated that the public did not believe that the penalties issued against The University were equitable and fair, compared to penalties the NCAA had imposed on other member institutions for similar violations. Much of the discussion focused on the fact that The University recognized that it was not innocent of the violations, but that the punishment did not fit the offense, in light of The University's self-imposed penalty of disassociation of the boosters and loss of scholarships and The University's aggressive restructuring of its compliance department.
In 1998, The University was investigated after The University reported to the NCAA that it had violated certain rules when an assistant basketball coach contacted two athletic representatives and attempted to solicit money from them to pay high school coaches to "steer" their players to Alabama. When The University learned of the potential rule violations, The University initiated an internal investigation, a step The University had been criticized for not taking in the 1995 case; verified that violations had occurred; fired the coach, and, in compliance with NCAA procedures, which require an institution to notify the NCAA of rule violations, reported the violations to the NCAA. The NCAA praised The University's compliance team, placed a show-cause order on the fired coach for four years, and extended The University's probationary period.
Once again, public discussion was generated about the NCAA's treatment of The University. The public was dismayed that, although The University did exactly what the NCAA and its rules required, complied with the rule-enforcement process by self-reporting the violation to the NCAA, and imposed an appropriate self-punishment, the COI extended the probationary period. The public voiced frustration that despite The University's compliance with the enforcement process, The University was not rewarded for its efforts. Public debate focused on whether The University should self-report rule violations and actively comply with the enforcement process when there appeared to be no benefit to The University in doing so.
In February 2000, the enforcement staff began investigating various alleged rule violations by The University's football program, its staff, and its athletic representatives. Initially, The University's football program was suspected of violating various rules with regard to the recruitment of prospective student-athlete Albert Means from Memphis, Tennessee, who in February 2000 had signed a scholarship to play football at The University. The evidence indicates that in 1999 the NCAA and the Southeastern Conference ("the SEC"), of which The University is also a member, had been notified that Means's high school coach was attempting to solicit money from coaches at various universities and colleges in exchange for granting the coaches the opportunity to recruit Means to play football at their university or college. The evidence further indicates that although the NCAA and the SEC were aware that The University was recruiting *319 Means, they did not notify The University or its compliance staff about the potential rule violations with regard to this solicitation of money. The investigation expanded to include other alleged rule violations with regard to recruiting that occurred in 1997 and rule violations involving enrolled student-athletes by athletic representatives and a coach.
During the course of the investigation, Phillip Fulmer, the head football coach for the University of Tennessee, informed Richard A. Johanningmeier, the enforcement-staff investigator assigned to The University's case, that he believed Tom Culpepper, an independent recruiting scout and sportswriter, had information about the role that Logan Young, an athletic representative of The University, had played in recruiting Means to sign a scholarship to play football for The University.
In August 2000, Johanningmeier telephoned Culpepper to request an interview. After Johanningmeier agreed that any information Culpepper provided during the interview would be confidential, Culpepper agreed to be interviewed. During the interview, Culpepper stated that in January 2000 he drove Young from The University's postseason football game in Miami, Florida, to Young's residence in Memphis, Tennessee. During the drive, Culpepper and Young discussed football recruiting at The University. According to Culpepper, Young stated that he was going to pay Means's coach and others to secure Means's commitment to sign a scholarship to play football for The University. During this interview, Culpepper also stated that Young informed him that he had recruited Cottrell to be the recruiting coordinator for The University's football team, that Young had given Cottrell money to purchase his house in Tuscaloosa, that Cottrell had abandoned his wife and children in Tallahassee, Florida, that Young had paid one of Cottrell's gambling debts, and that Cottrell had arranged at least one fraudulent American College Test ("ACT") score for a prospective student-athlete. Lastly, Culpepper told Johanningmeier that although Young did not mention that Williams was involved in violations of NCAA rules, Culpepper believed that he was.
It also appears that during the period the NCAA was investigating these alleged rule violations and/or immediately thereafter, Culpepper made statements about Cottrell to "friends" who were members of the media. Culpepper told "friends" that Cottrell was a liar "without a job, and he's going to have a damn hard time finding one. And that's all there is to it," and that Cottrell had tried to ruin him, explaining "[Cottrell] slapped me, I slapped [him] back harder." He also made references to the coaches at The University as being "cheaters  recruiting cheaters" and to Williams as being a person who "funneled money" from Young to Means. These "friends" published the information Culpepper communicated about Cottrell and Williams in various media forums.
In October 2000, Cottrell became so concerned about the number and frequency of Culpepper's statements about him that he met with Culpepper in the presence of others in an attempt to resolve Culpepper's animosity toward him and to end Culpepper's verbal attack on his character and reputation. The evidence indicated, however, that Culpepper continued to make statements about Cottrell and that, sometime after December 2000, he told Terry Harrington and Bruce Parrish, both members of the media, that Cottrell had abandoned his family in Tallahassee; that Cottrell and his assistant had stolen videotapes from The University's athletic department; and that Cottrell had stolen *320 funds from the Shaun Alexander Foundation.[3]
In November 2000, Johanningmeier began conducting on-campus interviews at The University. Typically, during these interviews, in addition to Johanningmeier, Gene Marsh, Marie Robbins, the compliance director for The University's athletic department, and counsel for The University were present. Cottrell and Williams were both interviewed.
The evidence indicated that Cottrell was hired by The University's athletic department in 1997 as an assistant coach and recruiting coordinator for the football program. As part of his responsibilities as an assistant coach, Cottrell spoke to "Red Elephant Clubs" and individual chapters of The University's National Alumni Association and played in charity golf tournaments. Cottrell stated that he was frequently interviewed by sports writers and radio broadcasters about recruiting at The University. Indeed, Cottrell admitted that he was well known among the sports media and that he was regarded as a recruiting specialist. Additionally, the evidence established that before the 2000 NCAA investigation began, Cottrell had committed "minor" violations of NCAA rules and had been suspended from participating in recruitment for at least a month. In November 2000, following a season where the record was 3-8, Cottrell and the rest of the football coaching staff were fired. Nothing in the record indicates that Cottrell's firing was related to the violation of any NCAA rule.
The NCAA investigation established that although Cottrell had little involvement in recruiting Means, he did have a relationship with Young. The investigation also revealed information that Cottrell had violated several NCAA rules, including improperly accepting two loans from Young and improperly interacting with prospective student-athletes and enrolled student-athletes.
Johanningmeier also interviewed Williams, who was hired in 1994 as an assistant coach to coach running backs for The University's football team. In addition to coaching running backs, Williams, like other assistant coaches on The University's football staff, had recruiting duties. Williams was responsible for recruiting prospective student-athletes in the Memphis, Tennessee, area. Also, like Cottrell, Williams spoke to Red Elephant Clubs and individual chapters of The University's National Alumni Association, played in charity golf tournaments, and answered media questions, providing team and individual-player information.
Over 200 copies of articles published from 1994 to 2000 were submitted in evidence containing statements and comments made by Williams about various players, the team's preparation for games, the performance of football players during games, and the recruitment of prospective student-athletes. Like Cottrell, Williams was fired in November 2000, and nothing in the record indicates a relationship between his termination and any NCAA rule violations.
When Johanningmeier interviewed Williams, he questioned Williams about recruiting in general and specifically about Means. He also questioned Williams about Williams's relationship with Young. The enforcement staff concluded from the investigation that Williams had had an inappropriate relationship with Young and had violated NCAA rules with regard to *321 his recruitment of prospective student-athletes in the Memphis area and, in particular, Means.
Throughout the NCAA investigation that began in 2000, the media published detailed reports about the investigation on the radio and in the newspapers. The record contains copies of over 100 articles detailing information about the investigation and certain interviews.[4] Even though the investigation and the interviews conducted by Johanningmeier were supposed to be confidential, the evidence at trial established that the media were continually informed of the status of the investigation and the contents of some of the interviews. Indeed, testimony indicated that journalists often were aware of upcoming interviews and immediately following an interview would publish an article detailing the contents of the interview, including speculation about the impact the information revealed in the interview would have on the investigation. Cottrell and Williams testified that they were astounded by the specificity of the information reported by the media; neither Cottrell nor Williams, however, identified any specific source of the information they allege was "leaked" to the media,[5]
Johanningmeier reported the results of his investigation to the enforcement-staff team assigned to The University's case. The director then consulted with other enforcement-staff directors, and they determined, based on the information gleaned in the investigation, the specific charges to be made against The University, its staff, and its athletic representatives.
On February 2, 2001, the NCAA issued a preliminary LOI to The University. In September 2001, official LOIs were sent to The University, Cottrell, Williams, and others, listing various alleged rule violations and requesting a response to each alleged violation. The alleged rule violations occurred from 1997 through 2000 and included improper "offers and inducements" to prospective student-athletes and enrolled student-athletes by athletic representatives, "potential academic impropriety with student-athletes prior to their enrollment," and possible "unethical conduct" by coaches who either knew of or participated in the rule violations.
The LOI to The University charged the institution with various rule violations. On November 17, 2001, the COI conducted a hearing on the alleged rule violations against The University. The University defended the allegations. On February 1, 2002, the COI issued its infractions report, finding that The University had committed numerous rule violations and imposed several penalties, including a ban from postseason game appearances for two years, the loss of 21 scholarships over a three-year period, and placement on a five-year probationary period. The penalties severely affected The University's ability to compete in football, the amount of revenue The University generated from football, *322 and the amount of revenue The University received in its general scholarship fund from the football division of its athletic department.
Thomas Yeager, the chairman of the COI, during the teleconference announcing the penalties, stated that The University football program was "staring down the barrel of a gun" at a "death penalty"  a punishment that would terminate The University's football program. Classifying the violations as some of the worst that have ever been presented to the NCAA, Yeager stated that the determination of the penalty to impose for the violations was complicated by the fact that The University was a repeat offender and was on probation at the time of the misconduct.
In finding that The University had violated various NCAA rules, the COI focused mainly on the conduct of a "rogue" football athletic representative and some of "the largest money amounts" alleged in any NCAA rule-violation case involving the recruitment of a prospective student-athlete. The infractions report stated:
"While several serious allegations in this case involved the provision of extra-benefits to enrolled football student-athletes, at the heart of the case were football recruiting violations involving some of the largest money amounts alleged in any infractions case in the NCAA's history. . . .
". . . .
". . . Because of the university's repeat-violator history, including its experience with athletics representative misconduct, the number and seriousness of the violations, the visibility, prominence, and known predilections of the athletics representatives at the center of the violations, the committee seriously considered whether a finding of failure of institutional control might be warranted. The violations charged and the evidence presented by the enforcement staff cited athletics representatives as primarily culpable for the violations, not members of the university's current or prior staffs. The committee noted that it was limited by the scope and contours of the case as presented. Under the circumstances, the committee concluded that information in the case as, presented was too tenuous and insufficient to form the basis of a lack of institutional control."
(Emphasis added.) Despite the COI's scathing public censure and the imposition of severe penalties, it complimented The University and the efforts of its compliance team to investigate the rule violations. Yeager stated in the teleconference that he "did not see what else [The University] could have done" to prevent the violations by the athletic representatives.
Cottrell and Williams were the only two coaches on the coaching staff to receive LOIs. Williams's LOI charged that he had committed rule violations when he allegedly knew that Means's high school coach had requested money and a vehicle from Young to encourage Means to sign a scholarship to play football for The University and did not report the recruiting misconduct to The University, the SEC, or the NCAA; when he allegedly provided false and misleading information to Johanningmeier about the recruitment of Means; and when he allegedly exceeded the number of permitted visits to high schools in the Memphis area during the fall football-scouting evaluation period for 1999-2000. Before the COI hearing, the enforcement staff dismissed the charge against Williams with regard to the recruitment of Means and the charge that Williams failed to fully cooperate with Johanningmeier. Williams, however, admitted to exceeding the number of permitted visits to the Memphis area. The COI, recognizing the violation as one committed by The University, *323 did not impose a penalty against Williams.
Cottrell's LOI alleged the following three major rule violations:
1. That Cottrell's receipt of two loans from Young for $1,600 and $55,000, respectively, violated the rule against unauthorized salary enhancements;
2. That Cottrell had engaged in unethical conduct by "knowingly providing misleading information regarding the loans" to Johanningmeier; and
3. That Cottrell had failed to report academic fraud in connection with a prospective student-athlete's ACT score.
Cottrell's LOI also charged three secondary rule violations:[6]
1. That Cottrell improperly allowed a prospective student-athlete to make long-distance telephone calls from his office;
2. That Cottrell improperly intervened with state police on behalf of a student-athlete to have a speeding ticket dismissed; and
3. That Cottrell had improperly made arrangements for an athletic department's staff member to drive a prospective student-athlete to Cottrell's home to rest after the student-athlete had received over-the-counter medications from The University's training room.
In his response to his LOI and/or during the prehearing conference between Cottrell and the enforcement staff, Cottrell admitted to receiving the loans from Young, denied knowingly misleading the enforcement staff about the loans, denied committing academic fraud with regard to a prospective student-athlete's ACT score, admitted that he had allowed a prospective student-athlete to make long-distance telephone calls from his office, admitted assisting a student-athlete with a speeding ticket, and admitted assisting a prospective student-athlete when he was ill. Cottrell also admitted that he had arranged two free football tickets for a high school guidance counselor and that he had sold four postseason football game tickets to a student-athlete. These two latter violations were not charged in Cottrell's LOI.
At the prehearing conference, the enforcement staff dismissed the charge against Cottrell alleging that he had committed academic fraud with regard to a prospective student-athlete's ACT score but decided to pursue the rest of the alleged violations against Cottrell. After the hearing, the COI found that Cottrell did accept an improper salary enhancement when he accepted the loans from Young and that he had failed to fully and completely disclose information during his interview with Johanningmeier. The COI did not impose a penalty against Cottrell for these violations. However, in its "news release," the NCAA stated:
"[T]he committee considered imposing a show cause order on one of the former Alabama assistant coaches but decided not to do so because he was terminated by the university at the conclusion of the 2000 season and since that time has been out of college coaching, under what the committee considered to be a de facto show cause order."
The COI also found that Cottrell was not guilty of unethical conduct with regard to his failure to disclose the loans. The COI did not find the other alleged rule violations against Cottrell to be specific violations by Cottrell, but did find that the violations occurred, and they were considered violations committed by The University. No individual penalties, however, *324 were assessed against Cottrell for the violations.
Cottrell appealed the COI's finding that he failed to provide complete disclosure of the loans to Johanningmeier during his investigation. The appeals committee affirmed the COI's decision.
The COI's findings and a penalty-summary report with regard to The University's case were published on the NCAA's Web site on February 1, 2002. Even though the COI had not imposed any penalties against Cottrell, the published penalty-summary report stated that an eight-year show-cause restriction was imposed against the "recruiting coordinator." Additionally, the penalty-summary report indicated via a checkbox that a show-cause restriction had been placed on employees. These false statements were not corrected when the Web site penalty summary was updated to indicate that the COI's decision had been affirmed, and they remained on the NCAA Web site for nearly two years until Cottrell and Williams brought the false statements to the NCAA's attention.
The NCAA admitted that the information contained in the published penalty-summary report was false but maintained that its publication of the false information was a clerical mistake. It is without dispute that the statements were false because "The University of Alabama, Tuscaloosa Public Infractions Report" issued by the COI did not indicate that a show-cause provision had been imposed upon the recruiting coordinator or that a show-cause provision had been placed on "employees."[7]
Testimony at trial established that Cheryl DeWees, the administrative assistant for the director of the committee on infractions, created the penalty-summary report from the COI infractions report in The University's case and entered it onto the NCAA's Web site on the same day she created and entered on the Web site the penalty-summary report for the University of Kentucky case. She stated that she inadvertently typed the false statement regarding the show-cause provision for the recruiting coordinator from the University of Kentucky report into The University's report. She also stated that this mistake resulted in a default box being checked inadvertently, which indicated that a show-cause provision had been imposed against employees at The University.
Speculation about a pending NCAA investigation, the investigation of the alleged rule violations by The University, its staff, and its athletic representatives, and the findings of the COI and the penalties imposed *325 received substantial media coverage. For example, the parties submitted over 100 published newspaper and/or Internet articles from across the State discussing the alleged rule violations by The University, particularly the facts surrounding Means's recruitment, the NCAA's investigation into the alleged rule violations, and the penalties imposed. The articles discussed not only facts surrounding the alleged violations, investigation, and penalties, but also the NCAA's past treatment of The University with regard to rule violations and its present treatment of The University throughout the process. In light of the NCAA's past criticism that The University did not adequately enforce institutional control or investigate alleged violations, many of the articles published before the infractions report issued specifically focused on whether the NCAA would consider as mitigation The University's self-reporting of numerous violations, its self-imposition of penalties, and its aggressive internal investigation of the alleged rule violations in an effort to show compliance with the rules and the NCAA enforcement process.
The severity of the penalties imposed in the 2000 case rekindled the public debate as to whether the NCAA treated The University unfairly. Discussion focused on the fact that the NCAA and the SEC knew of the Means recruiting situation, but did not warn The University. Additionally, the public questioned the equity of the NCAA's treatment in light of the fact that The University was on probation for the self-reported 1998 NCAA rule violation and had received a harsh penalty in that case, despite the fact that The University had self-reported. Consequently, public debate focused on the propriety of the involvement of The University's compliance staff in the investigation, the benefit of self-reporting rule violations to the NCAA, and the NCAA's past and present treatment of The University.
Additionally, discussion focused on the NCAA's level of accountability with regard to the fairness of the investigative process and whether the penalties fit the violations. Specifically, the public debated the fairness of the NCAA's failure to inform The University of known information regarding potential recruiting-rule violations involving Means to allow The University an opportunity to prevent any improper conduct by its athletic representatives before it occurred. As in the 1998 debate, the public recognized that The University had violated NCAA rules, but it questioned the NCAA's treatment of The University in light of The University's proactive efforts to comply and to enforce the rules and the treatment of The University as compared to the treatment of other universities that had been found guilty of NCAA rule violations.
In late 2002, Cottrell and Williams sued the NCAA, Culpepper, and others, alleging against the NCAA and Culpepper claims of defamation, civil conspiracy, false-light invasion of privacy, negligence, and wantonness. These claims evolved from the NCAA investigation into The University's football program.[8]
With regard to the claim of defamation, Cottrell and Williams alleged that the NCAA and Culpepper published false statements that Cottrell and Williams were "involved in payoffs to a college football player and involved in various criminal activities." They further alleged that the NCAA made false statements to various media sources to the effect that Cottrell *326 and Williams had been involved in illegal recruiting practices, such as giving football tickets to and paying prospective studenta-thletes. Additionally, Cottrell and Williams alleged that the NCAA published false statements on its Web site that a show-cause provision had been imposed against them.
With regard to the false-light invasion-of-privacy claim, Cottrell and Williams alleged that the NCAA, Culpepper, and others by their false statements placed them in a false light before the public. Specifically, they alleged that the NCAA placed them in a false light before the public by publishing on its Web site for over two years false statements that a show-cause provision had been imposed against them. The negligence and wantonness claims against the NCAA also addressed the publication of the statements on the Web site.
Lastly, Cottrell and Williams alleged that the NCAA, Culpepper, and others entered into a conspiracy to destroy their coaching careers and personal reputations by making them the "scapegoats" in the investigation and sanctions. Specifically, they alleged that the NCAA, Culpepper, and others entered into a conspiracy that "caused and participated in actions to cause [false] statements [about them] to be published in the statewide news media and sent to various people in college football programs," which destroyed their reputations and ended their careers as college football coaches.
In May 2005, the NCAA and Culpepper moved for summary judgments. In their motions, they argued, among other things, that because Cottrell and Williams were limited-purpose public figures and they could not produce substantial evidence indicating that the NCAA or Culpepper had acted with actual malice in publishing the allegedly false statements, they were entitled to summary judgments. In June 2005, the trial court conducted a hearing on the summary-judgment motions and on July 7, 2005, the trial court entered an order stating:
"The plaintiffs bring five (5) counts in their complaints. The claims are as follows:
"1. Libel and slander [defamation claims].
"2. Invasion of privacy.
"3. Negligence.
"4. Wantonness.
"5. Civil conspiracy.
"Prior to addressing the claims, however, there are some questions of law that must be addressed by the court.
"First, if the plaintiffs are public figures, the plaintiffs must prove actual malice by the defendants on the defamation claims. The parties are all in agreement as to the legal standard to be applied to determine if the plaintiffs are public figures. The dispute arises in applying the proffered facts to the law.
"As one court stated: `Defining a public figure is like trying to nail a jelly fish to the wall.' (Rosanova v. Playboy Enterprises Inc., 411 F.Supp. 440 [(D.C.Ga.1976)]). A public figure can be a general-purpose public figure, or a limited purpose public figure. This court can say as a matter of law, without going into a lot of detail, that the plaintiffs do not satisfy the criteria of a general-purpose public figure. This would require the plaintiffs to have general fame or notoriety in the community, and pervasive involvement in ordering the affairs of society (Gertz v, Wetch[, 418 U.S. 323,] 94 S.Ct. 2997[ (1974)]).
"A limited purpose public figure is determined by reference to the individual's participation in the particular controversy giving rise to the defamation (Gertz, infra). A person may become a *327 limited purpose public figure in a matter of general public concern in one of four ways. By virtue of his position, by purposeful activity in thrusting [himself] into the public controversy, his close involvement with the resolution of matters of public concern, or by being drawn into the controversy. It is undisputed that the controversy regarding the charges against the University of Alabama was a matter of public concern.
"The court will then examine the four factors in reverse order. Since the Supreme Court decided Gertz, it has never again mentioned the `drawn into the controversy' factor again. This court has also not been able to find any other significant case whereby public figure status has been determined on that factor. Many legal experts feel that the Supreme Court has abandoned this factor (quote in Dombey v. Phoenix Newspapers Inc.[, 150 Ariz. 476,] 724 P.2d 562 [(1986)]). Since there exists no guidance or recent authority on this factor, this court is not going to bestow public figure status on the plaintiffs' based on the plaintiffs' being involuntarily drawn into the controversy.
"The third factor involves whether or not the plaintiffs have had a close involvement with the resolution of the controversy. The plaintiffs' names were mentioned early in the controversy, but they had little involvement with the resolution of the controversy other than giving their statements, and testifying at the infractions committee hearing.
"Factor two involves any purposeful activity in thrusting themselves into the controversy. The plaintiffs were under a gag order by the University of Alabama and the NCAA. They made no comments to the media, and quietly sat back during the NCAA investigation.
"The final factor involves looking at the individuals position with respect to matters of public concern, i.e., do the plaintiffs' positions give them regular access to the media on a regular and continuing basis. The defendants have presented evidence that from time to time the plaintiffs spoke to Red Elephant Clubs and quarterback clubs. Further, from time to time articles [were written in which they are cited or quoted], and interviews were given by them. There is also evidence that the head coach at The University of Alabama retains the duty to have regular access to the media, and to comment on the team status in all areas, and all areas of publicity. The assistant coaches [do] not. From this point the evidence stops as to plaintiff Ivy Williams. The court finds that as to plaintiff Ivy Williams, the facts of this case are similar to the Kentucky Supreme Court case of Warford v. Lexington Herald Leaderl,] 789 S.W.2d 758 [(Ky.1990)]. Under the facts of that case the assistant basketball coach was found not to be a public figure. Likewise, this court finds that plaintiff Ivy Williams's position was neither in such a position of public prominence that he was in a position to influence others, or the outcome of the controversy, nor did he enjoy regular and continuing access to the media.
"Plaintiff Ronnie Cottrell, on the other hand, was the recruiting coordinator at The University of Alabama. He was prominent enough that he was asked to have a charity golf tournament named after him. SEC Commissioner Roy Kramer stated in his deposition at page 256; `I told him since he got a lot of publicity, which he did for the good recruiting job he did at Alabama, he would always be under the scrutiny of other coaches, and other schools. We talked about that was a burden you pay as a *328 publicized recruiting coordinator at a high profile school such as The U of A.' . . . In Alabama, football recruiting is a matter of intense public concern, and invited public attention. The recruiting coordinator position at Alabama is a high profile position through which the plaintiff Ronnie Cottrell could be expected to assume a role of public prominence, as pointed out by Commissioner Kramer. As such, plaintiff Cottrell would have access to the media, and a potential to influence the outcome of the controversy that a private person would not have. Based on the facts, and case-law presented the court finds, as a matter of law, plaintiff Ronnie Cottrell was a limited purpose public figure.
". . . The plaintiffs' defamation, false light, and conspiracy claims arise out of statements made during and after the investigative process.
"The third issue is whether or not the affirmative defense of the two (2) year statute of limitations defeats recovery for any of the plaintiffs' claims. The Alabama case of Poff v. Hayes, 763 So.2d 234 (Ala.2000), as cited by the defendants, stands for the proposition that in defamation cases, the two (2) year statute of limitations runs from the date of the publication. That date is the date the injury to reputation occurs. This lawsuit was filed on 12/20/02; therefore any defamatory statements made prior to 12/20/00 are barred by the two (2) year statute of limitations. Likewise, any other claims arising before 12/20/00 are time-barred.
"The fourth issue arises out of the defendants' affirmative defense of qualified privilege. The qualified privilege may apply where one acts in good faith in complying with a request for information from a third party (see Clark v. America's First Credit Union, 585 So.2d 1367 (Ala.1991)). It also applies if it is prompted by a duty owed either to the public or a third party, or the communication is one in which the party has an interest and is made to another having a corresponding interest, if made in good faith, and without actual malice. The conditional, or qualified privilege would apply to the plaintiffs' claims arising out of the NCAA's letter of inquiry (LOI). It would also apply to the statements made by Tom Culpepper to defendant Richard Johanningmeier during the course of the investigation, and in the January and April 2001 conferences. The privilege can be overcome by proof that certain statements were not relevant to the investigation, were made in bad faith, or with actual malice. There is evidence before the court from which the jury could find that the privilege does not apply to some statements of defendant Tom Culpepper. There is no legally admissible evidence to overcome the privilege defense to the statements in the NCAA's LOI.
"These legal issues being decided, the court will now turn to the summary judgment motion. As a preliminary matter, this court was struck by the detailed time consuming, and thorough reconstruction of the NCAA investigation by the plaintiffs' attorneys. One cannot help but conclude that Dr. Marsh and Ms. Robbins are good and law-abiding individuals who strove to run a clean program. If the NCAA and SEC had made them privy to what Logan Young was doing, he would have been disassociated, Albert Means not signed, and the penalties against the University would have been less severe. There were two other major violations not involving the plaintiffs, which would have still resulted in severe sanctions against the U of A. However, after saying all this, The University of Alabama investigation is only *329 peripherally related to this case. The conspiracy that is relevant is a conspiracy by the defendants to defame the plaintiffs, and make them `the fall guys.'
". . . .
"The court will next examine plaintiff Ivy Williams's claims against the remaining defendants. Plaintiffs claims are limited to events that took place on, or after 12/20/00. Considering the evidence most favorably to said plaintiff, there is substantial evidence supporting a defamation claim of libel and slander against defendant Tom Culpepper. There is also substantial evidence supporting plaintiffs defamation, and invasion of privacy (false light) claims against the NCAA as a result of the publication on the NCAA web site. The negligence and, wantonness claims are subsumed within plaintiffs defamation claims, because that culpability is an element of the defamation claims.
"There being no dispute of a material fact, and remaining defendants being entitled to judgment as a matter of law on all other claims, summary judgment is granted in favor of the remaining defendants on all other claims.
"As to the claims of plaintiff Ronnie Cottrell against the NCAA, there is insufficient legally admissible evidence to support this plaintiffs burden of proving by clear and convincing evidence, actual malice, to support any defamation claims. The plaintiffs negligence and wantonness claims must also fail, because these degrees of culpability will not support a cause of action arising out of defamatory acts against a public figure. The admissible facts do not support a separate negligence or wantonness claim. Therefore, defendant NCAA being entitled to judgment, as a matter of law, on all plaintiffs claims against defendant NCAA, summary judgment is granted in favor of defendant NCAA, and against plaintiff Ronnie Cottrell.
"As to plaintiff Cottrell's claims against Thomas Culpepper, there is substantial evidence, if believed by a jury, supporting actual malice on said defendant's part, and defamatory statements which defendant Culpepper, either knew were false, or which were published with reckless indifference to their truth or falsity. As to the invasion of privacy claim, there was no substantial evidence, that the defendant made a publication to the public at large after 12/20/00. Further, there was no clear and convincing evidence of a conspiracy, to defame plaintiff Cottrell, specifically after 12/20/00 in support of a civil conspiracy claim. Further, there was no substantial legally admissible evidence that defendant Culpepper conspired with anyone to defame either plaintiff. Therefore, summary judgment is granted in favor of defendant Tom Culpepper, and against the plaintiff Ronald W. Cottrell on the civil conspiracy, and invasion of privacy claims. Summary judgment is denied as to the defamation and slander claim.
"As a footnote on the damage issue, there is a great deal of evidence that plaintiffs' damage, or injury to reputation was attributable to factors, other than the defendants' actions, such as: Milton Kirk's[9] revelations, statements by the U.S. Attorney in Memphis, media articles, comments, and rumors proliferated by sports talk shows, and internet web sites. The degree of damage attributable *330 to the defendants will, however, be a question for the jury to determine from all the evidence."
On July 12, 2005, the trial began governed by the trial court's pretrial determination that Cottrell was a limited-purpose public figure and Williams was a private person. Cottrell presented evidence indicating that in October 2000 he had met with Culpepper in the presence of others to discuss Culpepper's attack on his reputation and character. The testimony indicated, however, that after December 2000, Culpepper had made statements to individuals, who subsequently published the statements, to the effect that Cottrell had abandoned his family in Tallahassee, Florida; that Cottrell had stolen funds from the Shaun Alexander Foundation; and that Cottrell and his assistant had stolen videotapes of prospective student-athletes from The University's athletic department. Cottrell presented evidence indicating that these statements by Culpepper were not true. Additionally, the evidence indicated that Culpepper made statements creating the inference that Williams was unethical in recruiting and that he had assisted Young in funneling money to Means. According to the testimony, Culpepper made these statements about Cottrell and Williams in an angry, belligerent, vindictive tone. With regard to Cottrell, the evidence indicated that Culpepper had hostile feelings about Cottrell and wanted Cottrell out of college coaching.
The evidence tended to establish that Cottrell had suffered mental and emotional injury. Cottrell testified that he had been unable to obtain a job in college coaching and that he had been told that he needed to find a career outside college coaching. Cottrell, however, was not able to identify any potential employer who had relied on Culpepper's statements in refusing to offer Cottrell a college coaching job. He further explained that because he had been unable to obtain a job, he had been unable to provide financially for his family and had had to seek financial assistance from his parents, his brother, and his wife's mother. He testified that he has had to take prescribed medications to manage the stress and emotional upset. Cottrell's wife testified that Cottrell has trouble sleeping at night and that their personal finances and their marriage has suffered.
Williams testified that he had suffered mental and emotional injury. He too has been unable to find a steady job in college coaching. Williams stated that although he had had an offer to coach football at Miles College, the offer was rescinded when the Miles College athletic director learned of the NCAA investigation. Williams, however, admitted that he could not identify any potential employer who had relied upon the false statement in the NCAA penalty-summary report or the statements made by Culpepper as a reason not to hire him. Williams explained that he had suffered stress over financial issues and that he and his wife had had to sell their home and move into an apartment. The testimony indicated that as a consequence of what he considered to be an attack on Williams's reputation, Williams became disheartened, depressed, and lifeless.
At the close of Cottrell and Williams's case-in-chief, the trial court reconsidered Williams's status as a private person and held that Williams was a limited-purpose public figure. Additionally, the trial court held that because none of the evidence established that any of the alleged defamatory statements were actionable per quod, i.e., that the statements *331 resulted in special damages,[10] only the alleged defamatory statements that were actionable per se, i.e., that involved a crime of infamy or moral turpitude, would be submitted to the jury. The trial court then entered a judgment as a matter of law for the NCAA and for Culpepper on Williams's defamation claims. The trial court entered a judgment as a matter of law for the NCAA because Williams had not produced clear and convincing evidence that the NCAA acted with actual malice in publishing the defamatory statements on its Web site. With regard to Williams's defamation claim against Culpepper, the trial court found that the alleged defamatory statements were not actionable because Culpepper's statement that Williams funneled money to Means was not slander per se and Culpepper's other statement that Williams engaged in unethical recruiting was not actionable because it was a statement of opinion.
Culpepper, the sole remaining defendant, then presented his defense to the claims of Cottrell, the sole remaining plaintiff in the case. Culpepper's defense focused on whether Culpepper knew that the statements he made were false or whether he acted with reckless disregard as to whether they were true or not. He testified that the statements he made about Cottrell were based on information he had received from various present or former employees of The University's athletic department and that he had assumed that the statements were true. He admitted that he did not exercise good judgment when making the statements.
At the close of all the evidence, the trial court reconsidered Cottrell's status as a limited-purpose public figure with regard to the statements made by Culpepper to the effect that Cottrell had abandoned his family, had stolen funds from the Shaun Alexander Foundation, and had stolen videotapes from The University's athletic department. The trial court determined, based on all the evidence presented, that Cottrell was a private figure with regard to these statements. The trial court, therefore, instructed the jury that Cottrell had to prove by only a preponderance of the evidence that Culpepper negligently made the statements. The trial court did instruct the jury that to award punitive damages Cottrell had to establish that Culpepper made the statements with malice.
The jury returned a verdict in favor of Cottrell; Culpepper filed a motion for a new trial. Additionally, Cottrell filed a motion asking the trial court to address the applicability of an agreement between the NCAA and Culpepper to a determination of Culpepper's ability to pay damages.[11] On November 15, 2005, the trial court issued an order granting Culpepper a new trial, holding that Culpepper was prejudiced when the court changed Cottrell's status from a limited-purpose public figure to a private person at the close of the evidence. Specifically, the trial court held that if it had determined earlier in the proceedings that Cottrell was a private figure, Culpepper would have defended the case differently. The trial court further held that Cottrell's request regarding the *332 applicability of the agreement between the NCAA and Culpepper to Culpepper's ability to pay damages was moot in light of its ordering a new trial.
Cottrell and Williams appeal; Culpepper cross-appeals.

Standard of Review
This Court conducts a de novo review of rulings on a motion for a summary judgment and on a motion for a judgment as a matter of law. Bailey v. Faulkner, 940 So.2d 247, 249 (Ala.2006). In Butler v. Town of Argo, 871 So.2d 1, 11-12 (Ala. 2003), we recognized:
"`"[T]his Court uses the same standard the trial court used initially in granting or denying a [judgment as a matter of law]. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala. 1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case or the issue to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala.1992). For actions filed after June 11, 1987, the nonmovant must present `substantial evidence' in order to withstand a motion for a [judgment as a matter of law]. See § 12-21-12, Ala.Code 1975; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So.2d at 1353. In reviewing a ruling on a motion for a [judgment as a matter of law], this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. Motion Industries, Inc. v. Pate, 678 So.2d 724 (Ala.1996). Regarding a question of law, however, this Court indulges no presumption of correctness as to the trial court's ruling. Ricwil, Inc. v. S.L. Pappas & Co., 599 So.2d 1126 (Ala.1992).
"`. . . . '
"I.C.U. Investigations, Inc. v. Jones, 780 So.2d 685, 688 (Ala.2000)."
With regard to review of a trial court's ruling on a motion for a new trial, this Court has stated:
"`It is well established that a ruling on a motion for a new trial rests within the sound discretion of the trial judge. The exercise of that discretion carries with it a presumption of correctness, which will not be disturbed by this Court unless some legal right is abused and the record plainly and palpably shows the trial judge to be in error.'"
Curtis v. Faulkner Univ., 575 So.2d 1064, 1066 (Ala.1991) (quoting Kane v. Edward J. Woerner & Sons, Inc., 543 So.2d 693, 694 (Ala.1989)).

Discussion
I. Whether the trial court erred in its determinations with regard to the defamation claims.
A. Cottrell's and Williams's classifications in the context of their defamation claims.
Because many of the allegations of error hinge upon the classification of Cottrell and Williams as either public or private figures, the Court will first address the classification of Cottrell and Williams in the context of their defamation claims.
1. General law regarding a claim of defamation.
A court must determine as a matter of law a plaintiffs classification in the context of a defamation claim. White *333 v. Mobile Press Register, Inc., 514 So.2d 902 (Ala.1987). This determination will establish the plaintiffs burden of proof. New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). In defamation actions, a plaintiff is either a private person, a public official, or a public figure, either in general or for the limited purpose of a particular public controversy. Mead Corp. v. Hicks, 448 So.2d 308 (Ala. 1984). If a plaintiff is determined to be a public official, public figure, or limited-purpose public figure, then the plaintiff has the burden of establishing by clear and convincing evidence that the defamatory statement was made with "`actual malice'  that is, with knowledge that it was false or with reckless disregard of whether it was false or not." New York Times, 376 U.S. at 280, 84 S.Ct. 710; Curtis Publ'g Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967); Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); and White, 514 So.2d at 904. If it is determined that the plaintiff is a private figure, then the plaintiff has the burden of establishing by a preponderance of the evidence that the defendant negligently published the defamatory statement. Mead Corp., 448 So.2d at 312 (holding that "defendants who made false defamatory statements about private figures may be held liable if their conduct created an unreasonable risk of harm to the plaintiff). Whether an individual is a public figure, limited-purpose public figure, or private figure is a question of law to be determined by the court. Mobile Press Register, Inc. v. Faulkner, 372 So.2d 1282 (Ala. 1979). This determination must be made by the trial court before the jury is charged so that the court can properly instruct the jury. Faulkner, 372 So.2d at 1285.
A public figure is one who either has gained notoriety from his achievements or seeks public attention through vigor and success. New York Times, supra. In Gertz, the United States Supreme Court reduced the "public-figure question to a more meaningful context by looking to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation." 418 U.S. at 352, 94 S.Ct. 2997. Thus, the Court recognized a limited-purpose public figure as "an individual [who] voluntarily injects himself or is drawn into a particular public controversy." 418 U.S. at 351, 94 S.Ct. 2997.
In this case, the NCAA and Culpepper agree that neither Cottrell nor Williams is a public official or a general-purpose public figure. The NCAA and Culpepper, however, maintain that the evidence established that both Cottrell and Williams are limited-purpose public figures; Cottrell and Williams disagree, claiming that the evidence established that they are private figures. Therefore, we must determine whether the NCAA and Culpepper established that Cottrell and Williams were limited-purpose public figures.
2. The test for determining whether a plaintiff is a limited-purpose public figure and its application to the facts of this case.
In Gertz, the United States Supreme Court provided that it is the "nature and extent" of an individual's involvement in a public controversy, i.e., the extent to which the individual's participation is voluntary, the extent to which the individual has access to the media to counteract the false statements, and the prominence of the individual's role in the public controversy, that determines whether an individual is a limited-purpose public figure. 418 U.S. at 344-45, 94 S.Ct. 2997. In Little v. Breland, 93 F.3d 755, 757 (11th Cir.1996), the United *334 States Court of Appeals for the Eleventh Circuit recognized that in Silvester v. American Broadcasting Co., 839 F.2d 1491 (11th Cir.1988), it adopted the three-pronged test from Waldbaum v. Fairchild Publications, Inc., 627 F.2d 1287 (D.C.Cir.1980), to determine whether a plaintiff in a defamation action is a limited-purpose public figure with regard to a public controversy. Under the test, a court determining whether a plaintiff is a limited-purpose public figure must "`(1) isolate the public controversy, (2) examine the plaintiffs involvement in the controversy, and (3) determine whether the alleged defamation [was] germane to the plaintiffs participation in the controversy.'" In Hutchinson v. Proxmire, 443 U.S. Ill, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979), and Wolston v. Reader's Digest Ass'n, 443 U.S. 157, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979), the United States Supreme Court unequivocally established that it is the plaintiffs role in the controversy, not the controversy itself, that determines whether a person is a limited-purpose public figure with regard to the alleged defamatory statements. The three-pronged test applied in Little provides a workable means of determining whether a plaintiff in a defamation action is a limited-purpose public figure because of his role in a public controversy; this Court adopts it and will now apply it to the facts of this case.
a. Isolation of the public controversy.
In Waldbaum, the United States Court of Appeals for the District of Columbia provided the following discussion on how to address the first prong of this test, stating:
"As the first step in its inquiry, the court must isolate the public controversy. A public controversy is not simply a matter of interest to the public; it must be a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way. . . . [A] public controversy is a dispute that in fact has received public attention because its ramifications will be felt by persons who are not direct participants.
"To determine whether a controversy indeed existed and, if so, to define its contours, the judge must examine whether persons actually were discussing some specific question. A general concern or interest will not suffice. [Hutchinson v. Proxmire, 443 U.S. Ill (1979)]. The court can see if the press was covering the debate, reporting what people were saying and uncovering facts and theories to help the public formulate some judgment. It should ask whether a reasonable person would have expected persons beyond the immediate participants in the dispute to feel the impact of its resolution. If the issue was being debated publicly and if it had foreseeable and substantial ramifications for nonparticipants, it was a public controversy."
627 F.2d at 1296-98 (footnotes omitted).
Several factors lead to the conclusion that a public controversy existed before, during, and after the NCAA investigated the alleged rule violations by The University in 2000 and imposed the severe penalties against The University in 2002. In 2000, The University and the public learned about the NCAA's investigation into Young's involvement in recruiting Means and the federal charges that had developed. In light of The University's being on probation and in light of the efforts in 1998 by The University to comply with the enforcement rules and the NCAA's apparent disregard for that effort, a public debate developed about the 2000 investigation, including speculation on the *335 propriety of the involvement, of The University's compliance staff in the investigation, the benefit, if any, of The University's self-reporting NCAA rule violations, and the NCAA's treatment of The University. Additionally, discussion focused on the fairness of the investigation process itself and on the NCAA's accountability with regard to fitting the penalty imposed to the offense. Consequently, widespread local and statewide media coverage was generated for over three years as the media sought to unravel precisely what had happened that resulted in The University's being charged and found guilty of several rule violations.
The public concern for The University and its football program was evidenced by the number of articles written and the detail of the information provided from the first allegations of a recruiting scandal in Memphis, the revelation of a "secret witness" assisting the NCAA, in establishing the rule violations by The University, the statements made by Yeager that "The University of Alabama football program was staring down the barrel of a gun," the harshness of the penalties imposed, and the apparent inequity of the penalty in light of The University's efforts in compliance with the enforcement process.
Moreover, the citizens of Alabama had a legitimate interest in the controversy because The University is a public institution that receives State funds. The football program provides revenue for The University and, in light of the football program's tradition and history, is a source of pride for many of its graduates and the citizens of this State. Therefore, when "The University of Alabama football program was staring down the barrel of a gun"  facing potential termination of its football program  public discussion of all the circumstances creating the risk that the program could be terminated was rampant; a public controversy existed.
We reject Culpepper's argument that the public controversy included debate concerning the character, integrity, and fitness of Cottrell and Williams to coach and work for The University. Culpepper relies on the reasoning of the United States District Court for the Northern District of California in Barry v. Time, Inc., 584 F.Supp. 1110 (N.D.Cal.1984), in defining the public controversy in that defamation case. In Barry, Barry, a former head coach for the basketball team at the University of San Francisco ("USF") sued one of his former basketball players, alleging that the player had defamed him when the player accused him of assisting an athletic representative of the basketball team in making improper cash payments to the player in violation of NCAA rules. In determining whether Barry was a limited-purpose public figure, the district court held that a public controversy existed involving "the alleged recruiting violations at USF before Barry's acceptance of the position of head basketball coach." 584 F.Supp. at 1116. The district court noted that USF had twice been the subject of NCAA investigations involving USF's basketball program, that one of those investigations had led to the resignation of one head basketball coach and the other had led to the firing of the head coach who had preceded Barry, and that USF had been trying to solve the problems of its basketball program for many years. Additionally, the court noted that the president of USF, when he appointed Barry as head coach, "insisted upon a `clean' program." 584 F.Supp. at 1116. The court concluded that a public controversy existed because the reputation of USF was at stake and there was "a dispute as to what the University should do about allegations of recruiting violations." Id.
*336 Culpepper argues that the public controversy surrounding the investigation into alleged NCAA rule violations by The University is analogous. He reasons that because The University, like USF, was a repeat offender, intense scrutiny and substantial discourse regarding the rule violations developed. He further argues that because Cottrell and Williams were named in various articles as the coaches who were involved in the controversy, because they were closely associated with Young, and because they had been interviewed by the NCAA, a public debate developed about their character, integrity, and fitness. Culpepper, however, fails to recognize that although The University, like USF, was a repeat offender of NCAA rules, the public controversy did not focus on the actions of the coaching staff. Allegations of violations of NCAA rules by The University and by Cottrell and Williams did not lead to the resignation or firing of any of the football coaches. Indeed, none of the articles submitted impugned the character of Cottrell or Williams. Additionally, the articles did not suggest that the major violation of the NCAA rules was an ongoing problem involving football coaches or that The University had an "ongoing" problem that it had been trying to solve for years. Indeed, the evidence established that The University was making every effort to run a clean program and that, if the NCAA or the SEC had informed The University of the situation in Memphis, of which they were aware, actions would have been taken to prevent the egregious violation by the athletic representative who was the focus of the investigation. Unlike the public debate at USF, the public debate in this case did not question the reputation of The University or the integrity of its coaches; rather, the public debate concerned how the NCAA would view the efforts of The University to run a clean program and to engage in self-enforcement of NCAA rules. Therefore, evidence established that the focus of the public controversy surrounding The University was different from the public controversy involving USF. Based on the content, context, and forum of the controversy surrounding The University as presented in the record, we refuse to conclude that the public controversy involved the character, integrity, and fitness of Cottrell and Williams to coach and to work for The University.
In conclusion, a public controversy existed; therefore, we must now focus on the roles of Cottrell and Williams in the controversy.
b. The plaintiffs involvement in the controversy.
Consideration of this prong involves the plaintiffs prominence in the public controversy, the plaintiffs access to channels of effective communication to counteract false statements, and whether the plaintiff voluntarily thrust himself or was drawn into the forefront of the public controversy. Gertz, 418 U.S. at 344-45, 94 S.Ct. 2997. The court in Waldbaum stated:
"Once the court has defined the controversy, it must analyze the plaintiffs role in it. Trivial or tangential participation, is not enough. The language of Gertz is clear that plaintiffs must have `thrust themselves to the forefront' of the controversies so as to become factors in their ultimate resolution. . . . They must have achieved a `special prominence' in the debate. . . . The plaintiff either must have been purposely trying to influence the outcome or could realistically have been expected, because of his position in the controversy, to have an impact on its resolution. In undertaking this analysis, a court can look to the plaintiffs past conduct, the extent of the press coverage, and the *337 public reaction to his conduct and statements."
627 F.2d at 1297 (footnotes omitted; emphasis added).
The evidence does not support a conclusion that Cottrell and Williams tried to purposely influence the outcome of the public controversy; therefore, we must determine whether Cottrell and Williams realistically could have been expected, because of their positions in the controversy, to have an impact on its resolution. Thus, this factor rests upon their prominence in the public controversy, their access to channels of communication, and the "voluntary" injection of themselves into the public controversy.
i. The prominence of the plaintiff in the public controversy.
This inquiry involves evaluating whether the plaintiffs actions have resulted in his being "embroiled" in the public controversy. See Gertz, 418 U.S. at 345, 94 S.Ct. 2997 (holding that the limited-purpose public figures have "thrust themselves to the forefront of particular public controversies"). Perhaps the main question presented is would a reasonable person have expected Cottrell and Williams to play a significant role in determining the "outcome of the controversy." In this case, the "outcome of the controversy" relates to whether the NCAA would find that The University and its football program fully cooperated with the NCAA's investigation into the alleged rule violations and engaged in adequate self-policing and self-enforcement so as to avoid the "death penalty."
Cottrell and Williams argue that they did not play a prominent role in the controversy because, they say, the major focus of the investigation involved Young and his improper conduct in recruiting Means and did not focus on their alleged violations of NCAA rules. They assert that because they were minor participants in the investigation, they should not be considered as having any influence on the outcome of the controversy.
The evidence, however, established that Cottrell and Williams did play a prominent role in the public controversy. Newspaper articles focused on their conduct, their interviews with Johanningmeier, the violations alleged against them, and how their conduct would impact the COI's view of The University. Both Cottrell and Williams were charged with not providing full disclosure of information during an interview. Although the enforcement staff dropped the charge against Williams, it pursued the charge against Cottrell. The COI found that Cottrell had not complied with the rules in this regard. Therefore, the conduct of Cottrell and Williams did influence the way the NCAA viewed The University's compliance with the rules.
Additionally, the record established that Cottrell and Williams both associated with Young, who was the major focus of the NCAA investigation and the main reason for the severity of the penalties imposed. Both Cottrell and Williams admitted violating certain NCAA rules, and, although no penalty was imposed against either Cottrell or Williams, The University was penalized for Cottrell's and Williams's violations of various NCAA rules.
Although the evidence indicated that Cottrell and Williams were "caught up in the controversy against [their] will," the evidence adequately established that they had assumed by their actions and their association with Young a "prominent position in its outcome." Breland, 93 F.3d at 758.
ii. The plaintiffs "access to channels of effective communication."
In determining a plaintiffs involvement in the controversy, consideration must also *338 be given to the extent to which the plaintiff had access to channels of effective communication to counteract any false statements. Gertz, 418 U.S. at 344-45, 94 S.Ct. 2997.
The NCAA and Culpepper argue that Cottrell and Williams had adequate access to the media to effectively rebut the alleged defamatory statements. The NCAA and Culpepper submitted over 200 newspaper and Internet articles published over several years containing comments by Cottrell and Williams throughout their careers at The University. Additionally, the NCAA points out that at the time it published the false statements in the penalty-summary report neither Cottrell nor Williams were prohibited from talking with the press.
Cottrell and Williams argue that although they did enjoy limited access to the press as assistant coaches who were questioned about various prospective student-athletes and enrolled student-athletes, the NCAA rules prohibited them from discussing the NCAA investigation with the press and prevented them from being able to defend their reputations in the press. They maintain that this "gag order" prevented them from having access to the media and precluded a finding as a matter of law that they were limited-purpose public figures.
In Price v. Chaffinch, (No. 04-956, May 12, 2006) (D.Del.2006) (not reported in F.Supp.2d), the United States District Court addressed whether a "gag order" imposed by the defendant, which prevented the plaintiff from responding in the media to the defamatory statements made by the defendant, precluded a finding that the plaintiff was a limited-purpose public figure. In Price, the plaintiffs media access was nonexistent, in light of the defendant's imposition of a "gag order." The federal district court held that although this fact "cut against" a finding that the plaintiff was a public figure, the plaintiff was aware that a public controversy existed, yet he voluntarily assumed a position in the controversy. The court balanced the gag order against the plaintiffs voluntary assumption of risk in the controversy and concluded that the plaintiff was a "significant player in a controversy with high public interest." Consequently, the court held that the "gag order" imposed on the plaintiff was a factor to consider, but did not preclude a finding that the plaintiff was a limited-purpose public figure.
A similar circumstance was also addressed in Sculimbrene v. Reno, 158 F.Supp.2d 8 (D.D.C.2001), in which a former FBI agent sued a media commentator, alleging that the commentator conspired with others to defame him. The commentator attacked the agent's credibility with regard to statements he had made to various congressional bodies. The agent was unable to respond in the media to the attack because the FBI refused to allow him access to the media. The court; when addressing whether the agent was a limited-purpose public figure who had been drawn into a public controversy, focused on the agent's role in the controversy. In conducting the analysis pursuant to the Waldbaum test, the court noted that the agent's "access to the press, both prior to the relevant controversy and during the relevant controversy, was at all times, circumscribed by his employment by the FBI," and his employer prevented him from talking with the media. 158 F.Supp.2d at 23. Nevertheless, the court held that the agent was a limited-purpose public figure because his actions required the conclusion that the' agent had played a significant role in the outcome of the controversy. Therefore, although the "gag order" prevented the agent from having access to the media, this fact did not out-weigh *339 the evidence indicating that the agent had played a prominent role in the controversy or preclude a finding that the agent was a limited-purpose public figure.
We agree with the federal district courts that the imposition of a "gag order" does not necessitate a finding that an individual is not a limited-purpose public figure. It deserves weight in making the determination, but it does not prevent such a finding.
Here, the "gag order" prevented Cottrell and Williams from discussing their role in the NCAA investigation with the press. However, the evidence that Cottrell and Williams played a prominent role in the public controversy significantly outweighs the effect of the "gag order."
iii. The conduct of the plaintiff either voluntarily injecting himself into a particular public controversy or being drawn into the public controversy.
(a) A plaintiffs voluntary injection into the public controversy.
"A private individual, however, is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention." Wolston, 443 U.S. at 167, 99 S.Ct. 2701. "In general, to be a limited purpose public figure, the plaintiff must voluntarily thrust himself into the vortex of the dispute. From the voluntary act is derived the notion of assumption of the risk and the consequent fairness in labelling the person a public figure." Marcane v. Penthouse Int'l Magazine for Men, 754 F.2d 1072, 1083 (3d Cir.1985). In Waldbaum, the United States Court of Appeals for the District of Columbia elaborated on a plaintiffs voluntary injection into a particular public controversy, noting that a person becomes a limited-purpose public figure if he attempts "to have, or realistically can be expected to have, a major impact on the resolution" of the public controversy. 627 F.2d at 1292. A person who voluntarily injects himself into a particular public controversy "invites" attention and comment. See Hunter v. Hartman, 545 N.W.2d 699 (Minn.Ct.App.1996)(holding that a team doctor for a college football program was a limited-purpose public figure because he voluntarily commented in a book and on national television about the public controversy over a former head coach's coaching style); Daubenmire v. Sommers, 156 Ohio App.3d 322, 805 N.E.2d 571 (2004)(holding that a coach voluntarily injected himself into a controversy by injecting religion into public schools); Chevalier v. Animal Rehab. Ctr., 839 F.Supp. 1224 (N.D.Tex.1993)(holding that a zoologist voluntarily injected himself into a controversy by appearing on television, giving interviews, and attempting to orchestrate a counter letter-writing campaign); James v. Gannett Co., 40 N.Y.2d 415, 353 N.E.2d 834, 386 N.Y.S.2d 871 (1976) (holding that a belly dancer voluntarily injected herself into controversy by taking affirmative steps in the press to attract attention); and Oaks v. City of Fairhope, 515 F.Supp. 1004 (S.D.Ala.1981)(holding that a librarian voluntarily injected herself into controversy by presenting her case in press).
Additionally, a person can voluntarily inject himself into a public controversy by choosing a position that thrusts the person into the public controversy. In White v. Mobile Press Register, Inc., supra, this Court held that John C. White was a public figure because of "his choice of career as a high level executive in an industry that is the subject of much public interest and concern." 514 So.2d at 904. The Court reasoned that his choice of career exhibited "a voluntary decision to *340 place himself in a situation where there was a likelihood of public controversy." Id.
In Fiacco v. Sigma Alpha Epsilon Fraternity, 484 F.Supp.2d 158 (D.Me.2007), the district court held that David Fiacco, the director of judicial affairs at the University of Maine, was a limited-purpose public figure. With regard to the "voluntariness" factor of the determination, the court held that Fiacco, in light of his position, voluntarily injected himself into the public controversy. The court determined that newspaper articles in the record established that a public controversy existed concerning the student-disciplinary process at the University of Maine. The court observed that as director of judicial affairs, "Fiacco had the capacity to investigate allegations of student misconduct, adjudicate cases, conduct hearings himself and proscribe sanctions or refer a case to a committee for its action." 484 F.Supp.2d at 163. The court reasoned that "[t]he nature of the position thrust Fiacco into the public controversy surrounding the student disciplinary process." 484 F.Supp.2d at 172. The court concluded that because Fiacco voluntarily accepted the position of director of judicial affairs and that position placed him at the center of a public controversy, he had injected himself into the public controversy.
We conclude that Cottrell and Williams also injected themselves into the public controversy. When Williams accepted his coaching position in 1994 and Cottrell accepted his position in 1997, both men knew that The University was a member of the NCAA, that they were expected to comply with NCAA rules in a highly competitive environment, and that their actions would come under close scrutiny. Cottrell and Williams were both responsible for recruiting prospective student-athletes to sign scholarships to play football for The University. Both coaches were expected to abide by NCAA rules when recruiting prospective student-athletes. The nature of their positions at The University and the responsibilities of their positions thrust them into the public controversy concerning The University's compliance with NCAA rules. Like White and Fiacco, Cottrell and Williams made career choices that thrust them into positions involving much public interest and concern. The public controversy surrounding The University's compliance with NCAA rules began in 1995. Thus, by accepting their coaching positions, Cottrell and Williams "show[ed] a voluntary decision to place [themselves] in a situation where there was a likelihood of public controversy." Therefore, because Cottrell and Williams voluntarily accepted positions with The University's football program under such circumstances, we conclude that they injected themselves into the public controversy.[12]
(b) Whether the plaintiff wan drawn into public controversy.
A plaintiff is drawn into a public controversy when his actions invite *341 comment and attention, despite the fact that the plaintiff does not actively try or even want to attract the public's attention. See, e.g., Rosanova v. Playboy Enters., Inc., 411 F.Supp. 440 (S.D.Ga.1976), aff'd, 580 F.2d 859 (5th Cir.1978)(holding that Rosanova was a limited-purpose public figure because he consistently associated with underworld contacts and voluntarily engaged in a course of activity that was bound to invite attention and comment). Therefore, a person can be drawn into a public controversy based on his status, position, or association to the public controversy. See Swate v. Schiffers, 975 S.W.2d 70 (Tex.App.1998)(holding that a doctor was drawn into public controversy about the quality of his medical practice in light of the 24 articles written over 10 years describing the atrociousness of the doctor's medical practice).
The NCAA and Culpepper argue that Cottrell and Williams were drawn into the controversy because they played a role in the conduct that resulted in The University's being charged with various NCAA rule violations, they participated in the NCAA's investigation into those alleged rule violations, and they were the subject of numerous newspaper articles about the alleged rule violations. According to the NCAA and Culpepper, this evidence established that Cottrell and Williams were in positions that "invite[d] attention and comment" with respect to their participation in the controversy.
The evidence unequivocally established that by their actions Cottrell and Williams invited public scrutiny and should have expected public and media attention with regard to their conduct and involvement in the NCAA investigation of alleged rule violations and the surrounding public controversy. Articles detailed Cottrell's and Williams's conduct throughout the controversy, including their close association with Young, their interviews with Johanningmeier, the alleged rule violations made against them and their responses, and the penalties, or lack thereof, imposed against them. Additionally, the evidence established that Cottrell and Williams proactively engaged in the conduct that was the subject of alleged rule violations and admitted certain violations. Furthermore, their close association with Young, who was the central focus of the investigation, indicated that their conduct "invited public attention and comment." Without question, the evidence established that Cottrell and Williams engaged in a course of conduct with respect to the investigation and the surrounding controversy that was bound to invite attention and comment; therefore, Cottrell and Williams were drawn into the public controversy.
Indeed, it appears that there are similarities between Cottrell and Williams's being drawn into the public controversy by virtue of their alleged commission of violations of various NCAA rules and a defendant who has been drawn into a public controversy by virtue of being accused of a crime. In Wolston, the United States Supreme Court held that a person who engages in criminal conduct does not automatically become a public figure. The Court noted that the status of the criminal defendant should be determined by focusing on the "`nature and extent of an individual's participation in the controversy giving rise to the [alleged] defamation.'" 443 U.S. at 167, 99 S.Ct. 2701 (quoting Gertz, 418 U.S. at 352, 94 S.Ct. 2997).
In Ruebke v. Globe Communications Corp., 241 Kan. 595, 600-03, 738 P.2d 1246, 1251-53 (1987), the Kansas Supreme Court held that Ruebke, a criminal defendant, was a limited-purpose public figure because of the intense media coverage of the investigation into the triple murders Ruebke had been charged with; Ruebke's *342 voluntary act of turning himself in to the police to seek protective custody; and his arrest and indictment for the three murders. The court held that although no one factor standing alone would be sufficient to convey limited-purpose public-figure status on Ruebke, the factors considered as a whole sufficiently established that Ruebke was drawn into a situation that invited comment. The court stated:
"Individuals who do not seek publicity or consent to it, but through their own conduct or otherwise become a subject of public interest, may become limited public figures. Those who commit crime or are accused of it may wish to avoid publicity, but are nevertheless persons of public interest, concerning whom the public is entitled to be informed. Restatement (Second) of Torts § 652D, comment f (1976)."
241 Kan. at 600, 738 P.2d at 1251.
Although Cottrell's and Williams's conduct did not involve criminal activity, it did involve violations of NCAA rules, which impacted The University, its alumni, and the citizens of this State. Given the public nature of the conduct at issue here and the widespread media attention given the controversy, we hold that the evidence established that Cottrell and Williams were drawn into the public controversy.
c. Whether the alleged defamatory statements were germane to the plaintiffs participation, in the controversy.
The NCAA and Culpepper contend that the alleged defamatory statements were germane to Cottrell's and Williams's participation in the public controversy. Black's Law Dictionary 708 (8th ed.2004) defines "germane" as "relevant; pertinent."
i. The false statements made by the NCAA in the penalty-summary report posted on the NCAA Web site.
The statements made by the NCAA in the penalty-summary report involved the imposition of penalties for violations of NCAA rules by employees of The University. The statements indicated that a show-cause provision had been imposed against the recruiting coordinator and other employees of The University. These false statements were germane to the public controversy because a central issue of the public dispute was the nature of the penalties imposed by the NCAA against The University, its employees, and its representatives. As the NCAA stated, "the statements made by the NCAA during the infractions process and in the erroneous penalty summary all were related to the NCAA investigation." Therefore, the NCAA's statements about Cottrell and Williams in the penalty-summary report published on the NCAA Web site were germane to the public controversy.
ii. The false statements made by Culpepper about Cottrell.
Cottrell contends that the statements made by Culpepper to the effect that Cottrell stole funds from the Shaun Alexander Foundation, that he and his assistant stole videotapes from The University's athletic department, and that he had abandoned his family in Tallahassee were not germane to the public controversy. In support of his contention, Cottrell emphasizes that these statements were not used by the NCAA or The University to substantiate any of the rule violations he allegedly committed. Cottrell reasons that because they were not relied upon in the investigation, the statements were not germane to the public controversy.
*343 The record establishes that the statements made by Culpepper were not relevant to the public controversy. The public controversy did not focus on Cottrell's character or his fitness to coach, but on the investigative process and the NCAA's treatment of The University. Although one can argue that the public controversy implicitly involved Cottrell's character or his fitness to coach, the wealth of articles presented to this Court defining the public controversy do not lend themselves to such a conclusion. Therefore, we conclude that the statements made by Culpepper about Cottrell were not germane to the public controversy.
iii. The allegedly false statements made by Culpepper about Williams.
Culpepper made statements to the effect that Williams was a "recruiting cheater" and that he had funneled money from Young to Means. These statements described rule violations the NCAA was investigating and, therefore, were germane to the public controversy.
iv. The allegedly false statements made by the NCAA and, Culpepper in furtherance of their conspiracy to leak information to the media and to ruin Cottrell's and Williams's reputations.
Like the statements made by the NCAA in the penalty-summary report, these statements were germane to the public controversy because they were allegedly made during the NCAA investigation and involved information about various interviews and evidence relied upon by the NCAA in developing its charges of rule violations against The University and against Cottrell and Williams. Indeed, Cottrell and Williams do not refute the argument that these alleged defamatory statements were germane to the public controversy.
3. Conclusion
Because the evidence established that a public controversy existed, that Cottrell and Williams played a prominent role in the public controversy, and that the statements made by the NCAA in the penalty-summary report were germane to the public controversy, Cottrell and Williams were limited-purpose public figures with regard to the statements made by the NCAA in the penalty-summary report. Cottrell and Williams were also limited-purpose public figures with regard to the conspiracy claim against the NCAA and Culpepper alleging media leaks. With regard to the statements made by Culpepper about Williams, the evidence established that Williams was a limited-purpose public figure. Finally, the evidence established that Cottrell was a private person with regard to the statements made by Culpepper that Cottrell had abandoned his family and had stolen funds from the Shaun Alexander Foundation and videotapes from The University's athletic department.
The trial court did not err in its rulings concerning the classifications of Cottrell and Williams in their defamation claims.
B. Determination as a matter of law as to whether the defamatory statements involved a matter of public concern,
Culpepper contends that the trial court erred in denying his motion for a judgment as a matter of law because, he says, his statements about Cottrell involved matters of public concern and Cottrell did not present clear and convincing evidence of actual malice to establish a prima facie case of defamation.
*344 "[W]here it is determined that a private individual is alleging defamation, there must be a determination of whether the defamatory speech involves a matter of public concern." Ex parte Rudder, 507 So.2d 411, 416 (Ala.1987). If the matter is of public concern, then the defamed private individual must prove by clear and convincing evidence that the statements were made with actual malice, that is, "with knowledge that [the statements were] false or with reckless disregard of whether [they] were false or not." Nelson v. Lapeyrouse Grain Corp., 534 So.2d 1085, 1095 (Ala.1988).
The jury held that the following statements by Culpepper about Cottrell were defamatory:
1. That Cottrell stole funds from the Shaun Alexander Foundation;
2. That Cottrell and his assistant stole video tapes from The University's athletic department; and
3. That Cottrell had abandoned his family in Tallahassee.
With regard to Culpepper's statement that Cottrell stole funds from the Shaun Alexander Foundation, we conclude that this statement does not involve a matter of public concern. In Nelson, 534 So.2d at 1096, this Court held that a theft by an employee from a private company was not a matter of public concern. Similarly, we conclude that a theft by an individual from a foundation is not a matter of public concern. Theft of property from a private company or foundation does not involve a threat to public safety, a theft of public funds, or an abuse of public trust; therefore, statements made about thefts from private entities are not matters of public concern. Cf. Ex parte Rudder (holding abusive prescription-drug practices involved matter of public concern); Silvester (holding jai alai industry a matter of public concern); Rosanova (holding organized crime matter of public concern). Thus, because Culpepper's statement that Cottrell stole funds from the Shaun Alexander Foundation did not involve a threat to public safety or a misuse of public property or trust, the trial court did not err in denying Culpepper's motion for a judgment as a matter of law with regard to that statement.[13]
Likewise, the trial court did not err in denying Culpepper's motion for a judgment as a matter of law with regard to Culpepper's contention that his statement that Cottrell had abandoned his family involved a matter of public concern. This general statement does not suggest a threat to public safety, public funding, or public trust; therefore, the statement does not involve a matter of public concern.[14]
*345 Finally, the trial court did not err in denying Culpepper's motion for a judgment as a matter of law with regard to his statement that Cottrell stole videotapes from The University's athletic department. Culpepper argues that the trial court erred in holding that his statement that Cottrell stole videotapes from The University's athletic department did not involve a matter of public concern. We agree. Cottrell was an employee of The University's athletic department. The videotapes were the property of The University's athletic department. The athletic department is a department within The University. The University is a public institution, governed by a board of trustees appointed by the Governor of Alabama and approved by the legislature, and funded by the citizens of Alabama. Because this statement involved a theft from a public institution by' an employee of the institution, this statement involved a matter of public concern. Thus, the trial court erred in holding that the statement was not a matter of public concern.
Because Culpepper's statement that Cottrell stole videotapes from The University's athletic department involved a matter of public concern., Cottrell must present clear and convincing evidence of actual malice to satisfy his burden of proof for his defamation claim based on that statement to be submitted to the jury. Culpepper contends that the trial court erred in denying his motion for a judgment as a matter of law because, he says, Cottrell did not present clear and convincing evidence of actual malice with regard to this statement. According to Culpepper, Cottrell's evidence did not establish that he made the statement with "reckless disregard" as to whether the statement was false or not. The evidence, however, established that in October 2000, Cottrell, in the presence of others, met with Culpepper and asked him to stop making statements that impacted his reputation. Culpepper made the statement at issue after December 2000. Viewed in a light most favorable to Cottrell, the evidence created a jury question as to Culpepper's state of mind when he made the false statements. Therefore, the trial court did not err in denying Culpepper's motion for a judgment as a matter of law in this regard.
C. Determination as a matter of law as to whether Culpepper's statement that Cottrell had abandoned his family is actionable.
Culpepper contends that the trial court erred in denying his motion for a judgment as a matter of law because, he says, his statement that Cottrell had abandoned his family in Tallahassee is not slander per se.
"[I]t is clear from our decisions that in a slander action, to constitute slander actionable per se, the alleged slander must impute an indictable offense involving infamy or moral turpitude. Marion v. Davis, 217 Ala. 16, 114 So. 357, 55 A.L.R. 171 (1927), quoted with approval in Tonsmeire v. Tonsmeire, 281 Ala. 102, 199 So.2d 645 (1967). We do not think the alleged slander here is actionable per se. We do not believe that being `fired and rehired' imputes an indictable offense involving infamy or moral turpitude; nor does `committing assault and battery' (assuming it is a part of the defamation charged). Dudley v. Horn, 21 Ala. 379 [(1852)]; Gillman v. State, 165 Ala. 135, 136, 51 So. 722 [(1910)]. `Infamy' is defined, by Black's Law Dictionary, Fourth Edition, as:
"`INFAMY. A qualification of a man's legal status produced by his *346 conviction of an infamous crime and the consequent loss of honor and credit, which, at common law, rendered him incompetent as a witness, and by statute in some jurisdictions entails other disabilities. State v. Clark, 60 Kan. 450, 56 P. 767.'
"`Moral turpitude signifies an inherent quality of baseness, vileness, depravity.' Gillman v. State, supra.
"However, as the court pointed out in Marion v. Davis, supra, viz:
"`This distinction, however, does not deny the right to maintain an action for slander founded on oral malicious defamation subjecting the plaintiff to disgrace, ridicule, odium, or contempt, though it falls short of imputing the commission of such crime or misdemeanor. In such case the law pronounces the words actionable per quod only, and the plaintiff must allege and prove special damages as an element of the cause of action.' . . . [Emphasis supplied]
"`Per quod' is defined in Black's Law Dictionary, Fourth Ed., at p. 1293:
"`PER QUOD. Lat. Whereby. When the declaration in an action of tort, after stating the acts complained of, goes on to allege the consequences of those acts as a ground of special damage to the plaintiff, the recital of such consequences is prefaced by these words, "per quod," whereby; and sometimes the phrase is used as the name of that clause of the declaration.
"`Words "actionable per quod" are those not actionable per se upon their face, but are only actionable in consequence of extrinsic facts showing circumstances under which they were said or the damages resulting to slandered party therefrom. Smith v. Mustain, 210 Ky. 445, 276 S.W. 154, 155, 44 A.L.R. 386.'
"It seems clear that since no allegation of special damages is made in the complaint, the demurrers were properly sustained by the trial court."
Brown v. W.R.M.A. Broad Co., 286 Ala. 186, 188, 238 So.2d 540, 541-42 (1970) (footnote omitted). A decision whether a statement is reasonably capable of a defamatory meaning is a question of law. Harris v. School Annual Publ'g Co., 466 So.2d 963. 964 (Ala.1985).
At the close of the evidence, the trial court held that Culpepper did not establish special damages; therefore, the statements were not actionable as slander per quod. Cottrell does not contest this ruling; therefore we will not review it. Thus, for Culpepper's statement that Cottrell had abandoned his family to be actionable, he must establish that the statement is slander per se, i.e., the statement imputed an indictable offense involving infamy or moral turpitude.
"When determining whether a statement is actionable as slander per se, a court must give the language used `that meaning that would be ascribed to the language by a reader or listener of "average or ordinary intelligence, or by a common mind."' Camp v. Yeager, 601 So.2d 924, 927 (Ala.1992), quoting Loveless v. Graddick, 295 Ala. 142, 148, 325 So.2d 137, 142 (1975). . . . [T]he alleged slanderous statement must be construed in connection with the other parts of the conversation, in order to determine the context in which the statement was made."
Liberty Nat'l Life Ins. Co. v. Daugherty, 840 So.2d 152, 157-58 (Ala.2002).
Cottrell contends that Culpepper's statement that he abandoned his family described a violation of § 13A-13-5, Ala. Code 1975, which states, in pertinent part:

*347 "A man or woman commits the crime of abandonment of a child when, being a parent, guardian or other person legally charged with the care or custody of a child less than 18 years old, he or she deserts such child in a place with intent wholly to abandon it."
Cottrell contends the statement also describes a violation of § 13A-13-4, Ala.Code 1975, which provides, in part:
"A man or woman commits the crime of nonsupport if he or she intentionally fails to provide support which that person is able to provide and which that person knows he or she is legally obligated to provide to a dependent spouse or child less than 19 years of age."
We, however, cannot conclude that the statement that Cottrell had abandoned his family imputed the above indictable offenses.
In Blevins v. W.F. Barnes Corp., 768 So.2d 386 (Ala.Civ.App.1999), the Alabama Court of Civil Appeals held that a statement that the plaintiff "tried to extort money out of me because I refused to pay his demands" was not slander per se. The Court of Civil Appeals reasoned that because the word "extort" had at least two meanings, the statement at issue was not slander per se.
Like the word "extort," the word "abandon" is not limited in meaning to that defined by the criminal statutes. "Abandon" is defined as:
"1a: to give up to the control or influence of another person or agent b: to give up with the intent of never again claiming a right or interest in . . . 2: to withdraw from often in the face of danger or encroachment . . . 3: to withdraw protection, support, or help from . . . 4: to give (oneself) over unrestrainedly 5a: to cease from maintaining; practicing, or using . . . b: to cease intending or attempting to perform."
Merriam-Webster's Collegiate Dictionary 1-2 (11th ed.2003). The term "abandon" has too many meanings to necessarily suggest the indictable criminal offenses. Additionally, the record does not contain portions of Culpepper's conversation discussing Cottrell's alleged abandonment of his family to establish the context of the statement. Because the word "abandon" has more than one meaning and because we have no facts to establish the context in which the statement was made, we cannot conclude that Culpepper's statement that Cottrell had abandoned his family charged an indictable offense. Therefore, the statement is not slander per se.
Because the statement is not slander per quod and because Cottrell did not establish that the statement that he had abandoned his family was slander per se, the trial court erred in denying Culpepper a judgment as a matter of law on this claim of defamation.
D. Williams's claim of defamation against Culpepper.
Williams appears to inartfully challenge the trial court's rulings with regard to Culpepper's statements about him. Culpepper contends that the trial court properly entered a judgment as a matter of law for him with regard to Williams's claims of defamation because, he says, the trial court properly concluded that the statements were not actionable.
The trial court held that the evidence did not establish that Culpepper's statements were slander per quod and Williams does not challenge this holding. Therefore, Williams had to establish that Culpepper's statement were slander per se. Neither the statement that Williams was a "recruiting cheater" nor the statement that he funneled money from Young to Means imputed a crime of infamy or moral *348 turpitude. Therefore, these statements were not slander per se.
Because Williams did not establish that Culpepper's statements were actionable; the trial court properly entered a judgment as a matter of law for Culpepper in this regard.
II. Whether the trial court erred in its rulings involving the defamatory statements made by the NCAA in the penalty-summary report posted on the Web site, including the claim of invasion of privacy, which also stemmed from, the statements made in the penalty-summary report.
In Butler, this Court defined the elements of the tort of invasion of privacy, stating:
"`"This Court defines the tort of invasion of privacy as the intentional wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities."' . . .
". . . .
". . . [T]his Court has adopted the following definition for `false light' invasion of privacy:
"`"One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
"`"(a) the false light in which the other was placed would be highly offensive to a reasonable person, and
"`"(b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed."'
"Schifano v. Greene County Greyhound Park, Inc., 624 So.2d 178, 180 (Ala.1993)(emphasis omitted)(quoting Restatement (Second) of Torts § 652E (1977)). A false-light claim does not require that the information made public be private; instead, the information made public must be false. See Restatement (Second) of Torts § 652E cmt. A. (1977)."
871 So.2d at 12.
Cottrell and Williams contend that they presented clear and convincing evidence that the NCAA made the false statements in the penalty-summary report with actual malice, creating, they say, a question for the jury to resolve. Specifically, they argue that the evidence established that the NCAA knew that the statements made in the penalty-summary report were false and that the NCAA exhibited a reckless disregard for the veracity of the statements when they published the penalty-summary report without proofreading the report for accuracy. Therefore, with regard to this claim Cottrell argues that the trial court erred in entering a summary judgment for the NCAA, and Williams argues that the trial court erred in entering a judgment as a matter of law for the NCAA.
"`In a [defamation] action brought by a public figure, summary judgment for the defendant is appropriate unless the plaintiff produces the clear and convincing evidence that a reasonable jury would need in order to find that the defendant published the defamatory material with actual malice.' McFarlane v. Sheridan Square Press, Inc., 91 F.3d 1501, 1508 (C.A.D.C.1996); see Finebaum v. Coulter, 854 So.2d 1120, 1128-29 (Ala.2003). `[T]here is no genuine issue [of material fact] if the evidence presented in the opposing affidavits is of insufficient caliber or quantity to allow a rational *349 finder of fact to find actual malice by clear and convincing evidence.' Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); see also Pemberton v. Birmingham News Co., 482 So.2d 257, 259-60 (Ala.1985).
"This standard is satisfied by proof that a false statement was made `"with knowledge that it was false or with reckless disregard of whether it was false or not."' Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. 657, 659, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989)(quoting New York Times v. Sullivan, 376 U.S. [254] at 279-80, 84 S.Ct. 710 [(1964)]). A defendant acts with `reckless disregard' if, at the time of publication, the defendant `"entertained serious doubts as to the truth of [its] publication" or acted "with a high degree of awareness of . . . [its] probable falsity."' McFarlane, 91 F.3d at 1508 (quoting St. Amant [v. Thompson], 390 U.S. [727] at 731, 88 S.Ct. 1323 [(1968)])(emphasis added). `The actual malice standard is subjective; the plaintiff must prove that the defendant actually entertained a serious doubt.' Id. (emphasis added). See Sanders v. Smitherman, 776 So.2d 68, 71 (Ala.2000); Finebaum, 854 So.2d at 1124; see also Revell v. Hoffman, 309 F.3d 1228, 1233 (10th Cir. 2002); Flowers v. Carville, 310 F.3d 1118, 1131 (9th Cir.2002); Chafoulias v. Peterson, 668 N.W.2d 642, 654 (Minn. 2003).
"Malice can be shown by circumstantial evidence showing, for example, `that the story was (1) "fabricated," (2) "so inherently improbable that only a reckless man would have put [it] in circulation," or (3) "based wholly on" a source that the defendant had "obvious reasons to doubt," such as "an unverified anonymous telephone call."' McFarlane, 91 F.3d at 1512-13 (quoting St. Amant, 390 U.S. at 732, 88 S.Ct. 1323). However, malice cannot be `measured by whether a reasonably prudent man would have published, or would have investigated before publishing.' St. Amant, 390 U.S. at 731, 88 S.Ct. 1323 (emphasis added). Indeed, the failure to investigate does not constitute malice, unless the failure evidences `"purposeful avoidance,"' that is, `an intent to avoid the truth.' Sweeney v. Prisoners' Legal Servs., 84 N.Y.2d 786, 793, 647 N.E.2d 101, 104, 622 N.Y.S.2d 896, 899 (1995) (quoting Connaughton, 491 U.S. at 693, 109 S.Ct. 2678); see Gertz v. Robert Welch, Inc., 418 U.S. 323, 332, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974)."
Smith v. Huntsville Times Co., 888 So.2d 492, 499-500 (Ala.2004).
Viewed in a light most favorable to Cottrell and Williams, the evidence indicates that DeWees, the creator of the penalty-summary report, made a clerical error when she was posting the report on the NCAA's Web site and does not indicate actual malice. Her deposition testimony and her testimony at trial clearly indicates that she was unaware that the statements were false and that the error was at most negligence. "A mistake is clearly insufficient to support a finding of actual malice." Medure v. Vindicator Printing Co., 273 F.Supp.2d 588, 598 (W.D.Pa.2002); Gulf Publ'g Co. v. Lee, 434 So.2d 687 (Miss.1983); Long v. Arcell, 618 F.2d 1145, 1148 (5th Cir.1980)(a defendant "who merely is careless may not be held liable for defaming a public figure"). Additionally, the evidence does not support a finding "of highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers." Curtis Publishing, 388 U.S. at 158, 87 S.Ct. 1975 (holding that such evidence of "extreme departure" from reasonable *350 publishing standards can indicate actual malice). The trial court properly entered a summary judgment for the NCAA on Cottrell's claims of defamation and invasion of privacy involving the posting of the false statements on the NCAA Web site. Likewise, the trial court properly entered a judgment as a matter of law for the NCAA with regard to Williams's claims involving the Web site.
Williams contends that because the trial court changed his classification to a limited-purpose public figure at the close of his case-in-chief and thereby elevated his burden of proof to require that he present evidence of actual malice to establish a prima facie case of defamation, he was prejudiced and should be granted a new trial. When the trial court reevaluated Williams's classification at the close of his case-in-chief and determined that he was a limited-purpose public figure, the trial court permitted Williams to reopen his case to present evidence of actual malice with regard to the penalty-summary report. Williams presented DeWees's testimony. Williams did not argue that he had additional evidence of actual malice that he had been prevented from presenting. Additionally, he did not argue that the timing of the trial court's ruling impacted his trial strategy to his detriment or prevented him from presenting evidence. There is no evidence in the record that lends itself to a conclusion that Williams was prejudiced by the reclassification, and Williams did not, in his briefs to this Court or during oral argument, direct this Court to any evidence of prejudice. Therefore, any error in the trial court's changing Williams's burden of proof at the close of the evidence, in light of the trial court's allowing Williams to reopen his case and present additional evidence, was at most harmless. Rule 45, Ala. R.App. P.
Cottrell further maintains that the trial court erred in entering a summary judgment for the NCAA on his claims of defamation and invasion of privacy with regard to the false statements in the penalty-summary report because, he says, the trial court erred in not considering the deposition of Shepard C. Cooper, the director for the COI, before making its determination. This issue, however, is not preserved for our review.
The trial court conducted a hearing on the summary-judgment motions on June 23, 2005; the order was issued on July 7, 2005; Cottrell deposed Cooper on July 8, 2005, and the trial began on July 12, 2005. At the June 23 hearing, the trial court stated that Cottrell could supplement his motion in opposition to summary judgment with the deposition testimony of DeWees and Cooper. Cottrell, however, was unable to depose Cooper until July 8, 2005, the day after the trial court issued its order. This Court recognizes that the transcription of Cooper's deposition required time; however, the record does not contain any request by Cottrell after the trial court issued its order for leave to file Cooper's deposition or a request that the trial court reconsider its summary-judgment decision in light of Cooper's testimony. "The purpose of requiring a specific objection to preserve an issue for appellate review is to put the trial judge on notice of the alleged error, giving an opportunity to correct it before the case is submitted to the jury." Ex parte Works, 640 So.2d 1056, 1058 (Ala.1994). Moreover, "[t]his Court cannot consider arguments raised for the first time on appeal; rather, our review is restricted to the evidence and arguments considered by the trial court." Andrews v. Merritt Oil Co., 612 So.2d 409, 410 (Ala.1992); Shiver v. Butler County Bd. of Educ., 797 So.2d 1086, 1089 (Ala.Civ.App.2000)(holding that *351 an appellate court will not consider an issue on which the trial court was not given the opportunity to rule).
III. Whether the trial court erred in entering a summary judgment for the NCAA and Culpepper on the claims involving "conspiracy media leaks."
Cottrell and Williams contend that the trial court erred in entering summary judgments for the NCAA and Culpepper with regard to their claim of defamation involving "conspiracy media leaks" because, they say, they presented substantial evidence creating a genuine issue of material fact as to whether the NCAA and Culpepper conspired to defame them.
It appears that during the NCAA investigation, information about the NCAA's interviews conducted with Cottrell and Williams was published in various newspapers, sometimes the day after the interview. Cottrell and Williams maintained that the NCAA, specifically Johanningmeier, and Culpepper, leaked information to the media to make them the "scapegoats" of the investigation, to ruin their coaching careers, and to cast them in a bad light. Cottrell and Williams argue that the leak of the information was particularly objectionable in light of their efforts to cooperate with the NCAA and their refusal to discuss any part of the investigation with the press in accordance with the NCAA confidentiality rule. Cottrell and Williams maintain that although they abided by the confidentiality agreement, the NCAA did not.
In support of their argument, Cottrell and Williams cite evidence indicating that Johanningmeier spoke with media persons, including Culpepper and an investigative reporter for the American Broadcasting Company in Memphis, Tennessee, and that Culpepper and the investigative reporter published confidential' information.
The news articles that Cottrell and Williams cite, however, referred to their sources as "sources close to the NCAA probe" and "sources close to the investigation." None of the articles cited by Cottrell and Williams stated that "the information contained therein emanated from conversations with NCAA personnel." The evidence established that several individuals were present during the interviews conducted by the NCAA. In addition to the person being interviewed and Johanningmeier, the evidence indicates that Marsh, Robbins, counsel for The University, and others attended and asked questions. Cottrell and Williams even stated in their complaint that some of the information came from Marsh. Additionally, Cottrell and Williams conceded in their depositions that they had no facts or evidence indicating that anyone at the NCAA leaked information to the press during the investigation. Finally, Cottrell and Williams did not present substantial evidence indicating that Culpepper made the statements allegedly leaked to the media. Therefore, based on this evidence, only speculation and conjecture support a conclusion that the NCAA or Culpepper conspired to ruin Cottrell and Williams and in furtherance of that conspiracy made these statements.
Viewing the evidence in a light most favorable to Cottrell and Williams, we conclude that substantial evidence was not presented that the NCAA or Culpepper were the sources of the leaked information or that they conspired to leak information to the media and to make Cottrell and Williams the scapegoats of the NCAA investigation.
IV. Whether the trial court properly ordered a new trial.
Cottrell maintains that the trial court erred when it concluded that Culpepper *352 was unduly prejudiced by its decision at the close of the evidence changing Cottrell's classification from a limited-purpose public figure to a private figure with regard to the defamatory statements made by Culpepper. Culpepper argued in his motion for a new trial that he was prejudiced by the trial court's ruling because during his cross-examination of Cottrell's witnesses and during the presentation of his defense, he elicited evidence to show that Cottrell's evidence did not establish actual malice. He further argued that if the law from the beginning of the case had been that Cottrell was a private person with regard to the statements made by him, he would have focused on defending against the lesser standard of common-law malice and he would have cross-examined Cottrell's witnesses to establish Cottrell's attitude about rule violations and the reasons why Culpepper disliked Cottrell. Culpepper's counsel further maintained that he would not have asked Culpepper questions such as, "[D]id you use good judgment at times with regard to saying things among your friends about Ronnie Cottrell?" Culpepper states that questions like these lend themselves to establishing common-law malice, not to defending against it. He further states that he would have "presented additional/different evidence and possibly called other witnesses."
We have thoroughly reviewed the record, and we conclude that Culpepper was prejudiced by the trial court's changing Cottrell's classification from a limited-purpose public figure to a private figure at the close of all the evidence. It is clear that Culpepper's strategy throughout the trial focused on establishing that Culpepper did not make the statements with actual malice and not on defending against a finding that he had made the statements negligently. Therefore, the trial court did not exceed the scope of its discretion when it ordered a new trial. Hayden v. Elam, 739 So.2d 1088, 1093 (Ala.1999)("[T]his Court will reverse an order granting a new trial when some legal right is denied and the record clearly shows that the trial court abused its discretion.").
V. Whether the trial court erred in denying Culpepper's motion for a judgment as a matter of law.
Culpepper contends that the trial court erred in denying his motion for a judgment as a matter of law because, he says, Cottrell did not present clear and convincing evidence that Culpepper made the statements with actual malice. Because we have concluded that Cottrell is a private person with regard to the statements made by Culpepper and did not have to present evidence of actual malice to establish a prima face case of defamation, this issue is moot. To the extent that Culpepper argues that the evidence does not support an award of punitive damages, we conclude that Cottrell presented sufficient evidence to create a jury question as to whether Culpepper made the statements with actual malice.
Although a failure to investigate alone does not indicate actual malice, evidence indicating the "purposeful avoidance of the truth" is sufficient to meet the standard of constitutional malice. Connaughton, 491 U.S. at 692, 109 S.Ct. 2678.
Culpepper admitted that he made the statements with no knowledge of whether the statements were true. Additionally, the evidence established that even though Cottrell had met with Culpepper in October 2000 to discourage Culpepper from making statements about him, Culpepper made these statements after December 2000. Therefore, viewing the evidence in a light most favorable to Cottrell, we conclude that he presented sufficient *353 evidence to present a jury question as to whether Culpepper made the statements with actual malice.
VI. Whether the trial court erred in its rulings involving the relevance of agreement between Culpepper and the NCAA and Cottrell's request for a Hammond hearing.
Cottrell and Williams contend that the trial court erred in its rulings with regard to the admissibility into evidence of an agreement between Culpepper and the NCAA because, they say, the evidence is relevant to Culpepper's ability to pay damages. Additionally, they argue that the trial court erred in ordering a new trial because, they say, a Hammond[15] hearing would remedy any impropriety with regard to the award of punitive damages. Because we conclude that the trial court's grant of a new trial was proper, these issues are moot.
VII. Whether the trial judge erred in refusing to permanently recuse himself.
Finally, Cottrell and Williams contend that this Court must order Judge Thomas S. Wilson, the trial judge who presided over his trial, to permanently recuse himself from this case. The record contains a letter from Judge Wilson to the Presiding Judge of the Tuscaloosa Circuit, dated August 7, 2006, stating:
"This letter is to put in writing our conversation of last week regarding the [Cottrell v. NCAA and Culpepper] case. As I informed you there has been a motion to supplement the record on appeal. There is also currently pending in the Supreme Court a motion to have the Supreme Court order me to recuse myself from further proceedings in the Cottrell case. There is also pending before the Judicial Inquiry Commission a motion by [Cottrell and Williams's counsel] to have them reconsider their order dismissing [Cottrell's and Williams's counsel's] complaint against me. Finally, there is pending before the Montgomery Bar Association Disciplinary Committee, a complaint filed by me against [Cottrell's and Williams's counsel]. Based on all these matters I feel that it is best that I temporarily recuse myself from hearing any matters in the case till the above matters are resolved. Depending on the final disposition of the above matters, I may have to permanently recuse myself. However, for the time being, I am asking you to reassign the case to another judge to handle any matters that might arise till further notice."
The presiding judge reassigned the case.
Cottrell and Williams argue that the trial judge exceeded the scope of his discretion by not permanently recusing himself from the case. Specifically, Cottrell and Williams argue:
"Judge Wilson's reasoning, however, is faulty, because the resolution of those matters, no matter how decided, cannot undo the appearance of bias nor erase the question of whether he can be impartial that was created by his bar complaint against [plaintiffs' counsel]."
In Ex parte George, 962 So.2d 789 (Ala. 2006), this Court stated:
"A trial judge's ruling on a motion to recuse is reviewed to determine whether the judge exceeded his or her discretion. See Borders v. City of Huntsville, 875 So.2d 1168, 1176 (Ala.2003). The necessity for recusal is evaluated by the `totality of the facts' and circumstances in each case. [Ex parte City of] Dothan *354 Pers. Bd., 831 So.2d [1] at 2 [(Ala. 2002)]. The test is whether `"facts are shown which make it reasonable for members of the public or a party, or counsel opposed to question the impartiality of the judge."' In re Sheffield 465 So.2d 350, 355-56 (Ala.1984)(quoting Acromag-Viking v. Blalock, 420 So.2d 60, 61 (Ala.1982))."
962 So.2d at 791.
The documents properly before this Court establish that Judge Wilson temporarily recused himself from this case and that he will consider permanent recusal, if circumstances require. Therefore, we cannot conclude based on the record before us that Judge Wilson exceeded the scope of his discretion. We recognize that Cottrell and Williams have attached exhibits to their briefs appearing to support their contention. However, an exhibit attached to a brief is not proper evidence for this Court's consideration. See Green v. Standard Fire Ins. Co. of Alabama, 398 So.2d 671, 673 (Ala.1981) (the record on appeal cannot be changed or altered by statements made in appellate briefs or evidence not appearing in the record).
To the extent that Cottrell and Williams contend that this Court errs in refusing to consider the issue of Judge Wilson's recusal as a request for mandamus relief, we conclude that they have not established a clear legal right to the relief they request.
"Mandamus is `proper to compel a court to perform ministerial duties and to entertain jurisdiction,' State v. Cannon, 369 So.2d 32, 33 (Ala.1979); it is also the proper method by which to review whether recusal is required. Ex parte Melof, 553 So.2d 554 (Ala.1989).
"We have often stated the standard for issuing a writ of mandamus:
"`A writ of mandamus is an extraordinary remedy, and it "will be issued only when there is: 1) a clear legal right in the petitioner to the order sought; 2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; 3) the lack of another adequate remedy; and 4) properly invoked jurisdiction of the court." Ex parte United Serv. Stations, Inc., 628 So.2d 501, 503 (Ala. 1993).'
"Ex parte Butts, 775 So.2d 173, 176 (Ala. 2000)."
Ex parte Little, 837 So.2d 822, 824 (Ala. 2002).
The information before us indicates that Judge Wilson has recused himself from this case; therefore, Cottrell and Williams have not established that Judge Wilson has refused to recuse himself and that they have been denied a clear legal right to the relief requested. Mandamus relief based on the information before us is not proper.

Conclusion
Based on the foregoing, the judgment of the trial court ordering a new trial for Culpepper is affirmed; the judgment denying Culpepper's motion for a judgment as a matter of law with regard to his statement that Cottrell had abandoned his family is reversed; the judgment denying Culpepper's motion for judgments as a matter of law with regard to his statements that Cottrell stole funds from the Shaun Alexander Foundation and that Cottrell stole videotapes from The University's athletic department is affirmed; the judgment matter of law for Culpepper with regard to Williams's defamation claim is affirmed; the summary judgment for the NCAA with regard to Cottrell's claims of defamation and invasion of privacy is affirmed; the summary judgment for the *355 NCAA with regard to Cottrell and Williams's claim of "conspiracy media leaks" is affirmed; the judgment as a matter of law for the NCAA, with regard to Williams's claims of defamation and invasion of privacy is affirmed; and this case is remanded for proceedings consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
COBB, C.J., and SEE, LYONS, WOODALL, SMITH, BOLIN, and PARKER, JJ., concur.
MURDOCK, J., concurs in the result.
SEE, J., files statement of nonrecusal (issued on April 25, 2007).
SEE, Justice (statement of nonrecusal).
Ronald W. Cottrell and Ivy Williams have filed a motion seeking my recusal in these appeals because I was a "fellow law professor and personal friend" of Gene Marsh, facts which, they assert, would cause a reasonable person to question my impartiality. I decline to recuse myself.
Canon 3.C.(1) of the Canons of Judicial Ethics states:
"(1) A judge should disqualify himself in a proceeding in which his disqualification is required by law or his impartiality might reasonably be questioned, including but not limited to instances where:
"(a) He has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding."
As I explained in my statement of nonrecusal in Dunlop Tire Corp. v. Allen, 725 So.2d 960, 976 (Ala.1998), "[t]he Constitution of the United States and the Constitution of Alabama of 1901 impose on judges the duty to decide cases." See also Pierson v. Ray, 386 U.S. 547, 554, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967) ("It is a judge's duty to decide all cases within his jurisdiction. . . ."); Federated Guar. Life Ins. Co. v. Bragg, 393 So.2d 1386, 1389 (Ala.1981) ("`[I]t is the duty of the judge to adjudicate the decisive issues involved in the controversy . . . and to make binding declarations concerning such issues, thus putting the controversy to rest. . . .'" (quoting 26 C.J.S. Declaratory Judgments § 161 (1956), pp. 374-75)). At the same time, "[t]he Due Process Clauses of the Constitution of the United States and of the Alabama Constitution require that a judge be a neutral decision-maker. U.S. Const. amend. XIV, § 1 (`No State shall . . . deprive any person of life, liberty, or property, without due process of law. . . . ')." Dunlop Tire, 725 So.2d at 976 (See, J., statement of nonrecusal); see also Concrete Pipe & Prods, of California, Inc. v. Construction Laborers Pension Trust for Southern California, 508 U.S. 602, 617, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993) ("[D]ue process requires a `neutral and detached judge. . . .'" (quoting Ward v. Village of Monroeville, 409 U.S. 57, 61-62, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972))).
Therefore, Canon 3.C.(1) must be applied in a way that balances the underlying policies of the judicial duty to decide cases and the need to preserve judicial impartiality. To serve the policy of preserving impartiality, courts require recusal not only for actual bias, but also for the appearance of bias. See Ex parte Monsanto Co., 862 So.2d 595, 605 (Ala.2003) ("`"The question is not whether the judge was impartial in fact, but whether another person, knowing all the circumstances, might reasonably question the judge's impartiality  whether there is an appearance of impropriety."'" (quoting Ex parte City of Dothan Pers. Bd., 831 So.2d 1, 5-6 (Ala. 2002), quoting in turn Ex parte Duncan, 638 So.2d 1332, 1334 (Ala.1994) (citations *356 omitted))). In Ex parte City of Dothan Personnel Board, .this Court stated:
"The test that remains applicable at all times, the answer to which always depends upon the `totality of circumstances' of each case, is whether a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find that there is a reasonable basis for questioning the judge's impartiality."
831 So.2d at 11.
We presume that a judge is unbiased. Ex parte Balogun, 516 So.2d 606, 609 (Ala. 1987) ("`For the law will not suppose a possibility of bias or favor in a judge who is already sworn to administer impartial justice and whose authority greatly depends upon that presumption and idea.'" (quoting Fulton v. Longshore, 156 Ala. 611, 613, 46 So. 989, 990 (1908))). "`"The burden of proof is on the party seeking recusal."'" Monsanto, 862 So.2d at 605 (quoting City of Dothan Pers. Bd., 831 So.2d at 9, quoting in turn Ex parte Cotton, 638 So.2d 870, 872 (Ala.1994)); see also Reeves v. State, 580 So.2d 49, 51 (Ala. Crim.App.1990) ("`The general rule in Alabama is that there is a presumption that a judge is qualified and unbiased and a person who alleges otherwise has the burden of proving that grounds [exist] for his allegations.'" (quoting McMurphy v. State, 455 So.2d 924, 929 (Ala.Crim.App.1984))).
I have no personal bias or prejudice concerning any party to these appeals, nor do I have any personal knowledge of the facts of the case underlying these appeals. See Canon 3.C.(1), Canons of Judicial Ethics ("A judge should disqualify himself in a proceeding in which . . . [h]e has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding. . . ."). Cottrell and Williams argue, however, that I should recuse myself from this case because during my time as a professor of law at the University of Alabama, "Dr. Gene Marsh, based upon information and belief, was a fellow law professor and personal friend of Justice See." Motion to recuse at 4. Professor Gene Marsh did join the law faculty while I was a member of that faculty, and I considered him and all the other members of that faculty friends. I would add to the "totality of circumstances" that it has been over 10 years since I left the law faculty at the University of Alabama. To the best of my recollection, during that 10 years I have spoken with Professor Marsh only once or twice, when I was at the law school in my capacity as a Justice of the Supreme Court. I have not spoken to Professor Marsh about this case, and, to the best of my recollection, he did not mention it when I saw him.
Cottrell and Williams argue that my relationship with Professor Marsh would lead a reasonable person to doubt my impartiality because Professor Marsh was formerly a defendant in this action and, they say, "has great disdain for [Cottrell and Williams]," Motion to recuse at 4-5; also, Professor Marsh is, they report, currently working with one of the appellees in this appeal  the National Collegiate Athlete Association. These allegations, however, do not overcome the presumption of impartiality. See Reeves, 580 So.2d at 51 ("`The fact that one of the parties before the court is known to and thought well of by the judge is not sufficient to show bias.'" (quoting McMurphy, 455 So.2d at 929, citing in turn Duncan v. Sherrill, 341 So.2d 946 (Ala.1977))); Ex parte Hill, 508 So.2d 269, 272 (Ala.Civ.App.1987) ("[I]t is an inescapable fact of life that judges serving throughout the state will necessarily have had associations and friendships with parties coming before their courts. A judge should not be subject to disqualification for such ordinary relations with his *357 fellow citizens."). Thus, considering the "totality of circumstances," I conclude that, "knowing all of the facts known to the [me]," there is not a "reasonable basis for questioning [my] impartiality." City of Dothan Pers. Bd., 831 So.2d at 11.
Because Cottrell and Williams's motion seeking my recusal does not establish actual partiality or demonstrate an appearance of partiality that would overcome the presumption of judicial impartiality, it is my constitutional duty to decide these appeals. See Ala. Const.1901, § 279 ("`I will support the Constitution of the United States, and the Constitution of the State of Alabama . . . and . . . I will faithfully and honestly discharge the duties of the office. . . .'"). Therefore, I decline to recuse myself.
NOTES
[1] The enforcement staff consists of full-time employees of the NCAA.
[2] The COI consists of individuals who are not "employees" of the NCAA, but who serve on a voluntary basis. Members of the COI include law professors, state or federal judges, attorneys, athletic directors, athletic-conference directors, and faculty athletic representatives.
[3] Shaun Alexander was a running back at The University of Alabama. He currently plays professional football.
[4] The record also contains copies of articles about the federal prosecution of Young, who was convicted of bribing a public official  Means's high school football coach. This prosecution evolved from Young's involvement in recruiting Means to sign a scholarship to play football for The University and his alleged payment of over $100,000 to Means's coach to guarantee that Means would commit to The University. The articles indicate that one of the witnesses in that trial testified that Williams assisted Young in paying Means's coach to secure Means's commitment to play football at The University.
[5] However, in their third amended complaint, Cottrell and Williams alleged "that a newspaper article revealing information contained in [Cottrell's] first interview was published which, based on Marsh's own statements, had to come from him or someone connected to him."
[6] These secondary rule violations had been self-reported to the NCAA by The University.
[7] Indeed, when Cottrell and Williams made their second request that the Web site information be corrected, the NCAA made the correction and included the following explanation on its Web site:

"The NCAA's web site contains a searchable database of major infraction reports and contains summaries of those reports. The penalty summary relating to the February 1, 2002, Public Infractions Report regarding The University of Alabama-Tuscaloosa, erroneously stated the recruiting coordinator had received an eight-year show cause requirement. This erroneous information was placed on the major infractions database through clerical error and has been corrected. The error appears to have been due to a sentence being transposed from the University of Kentucky's Public Infractions Report, whose recruiting coordinator did receive an eight-year show cause provision. The Alabama Public Infractions Report and the accompanying press release both correctly reflect that the former assistant coach did not receive a show cause requirement. The error was in the summary only. Although the former Alabama assistant coach also had the collateral responsibilities of recruiting coordinator, he was never identified as `the recruiting coordinator' in either the Alabama Public Infractions Report or the press release. The NCAA regrets the error."
[8] Cottrell and Williams sued other individuals and entities and pleaded numerous claims in their complaint and amended complaints. Only the claims mentioned and the defendants that are before us will be discussed in this opinion.
[9] Kirk was an assistant high school football coach at the school Means attended in Memphis.
[10] Evidence of special damages is evidence that the untrue statements resulted in a "`"material loss capable.of being measured in money."'" Butler v. Argo, 871 So.2d 1, 19 (Ala.2003)(quoting Shook v. St. Bede School, 74 F.Supp.2d 1172, 1180 (M.D.Ala. 1999), quoting in turn Restatement (Second) of Torts § 575 cmt. b. (1977)).
[11] Culpepper and the NCAA entered into an agreement pursuant to which the NCAA agreed to pay Culpepper's expenses in litigation resulting from his being a confidential witness for the NCAA. (This statement is a general description of the agreement and is not a finding as a matter of law.)
[12] We recognize that the Kentucky Supreme Court in Warford v. Lexington Herald-Leader Co., 789 S.W.2d 758 (Ky.1990), held that Warford, a former assistant basketball coach for the University of Pittsburgh basketball program, did not "thrust himself into a public concern surrounding recruiting." 789 S.W.2d at 770. The court's holding rested in part on the fact that at the time Warford was hired, the University of Pittsburgh had an unexceptional basketball program and competed in a conference that received little recognition. Here, Cottrell and Williams were hired as coaches for a football program that had won 12 NCAA championships and is a member of a highly competitive conference whose members consistently compete for the national championship. Thus, the facts surrounding the nature of Warford's position at the University of Pittsburgh and the nature of Cottrell's and Williams's positions at The University are easily distinguishable.
[13] This holding is limited to the facts and evidence in the record before us. We can envision instances when a party could establish that a theft from a charitable organization constitutes a matter of public concern. However, this record does not contain any information about the Shaun Alexander Foundation, its organizational classification, its purpose, or its funding. Additionally, the record docs not contain information regarding the source of the funds that were allegedly stolen. Because the record does not support a finding that the alleged theft from the Shaun Alexander Foundation involved a theft of money donated by the public or involved an abuse of public trust, we cannot conclude that the statement regarding the theft in this case involves a matter of public concern.
[14] We find the statement that Cottrell had abandoned his family to be distinguishable from the defamatory statements at issue in Forrester v. WVTM TV, Inc., 709 So.2d 23 (Ala.Civ.App.1997), a libel action against a television station, in which the Alabama Court of Civil Appeals held that disciplining a child in a public place is a matter of public concern. Here, we have a general statement that Cottrell abandoned his family with no further information. Such a general statement without more specificity and factual support does not support a conclusion that the statement involves a matter of public concern.
[15] Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986).