WOODALL, Justice.
 

 Latoya Duckett sued Ford Motor Company (“Ford”) and others, alleging strict-liability design-defect and negligence claims under Georgia law and seeking damages for injuries she suffered in an accident involving a Mercury Mountaineer sport-utility vehicle. The case went to the jury against Ford only, and the jury returned a verdict in Duckett’s favor on her strict-liability claim and in Ford’s favor on Duckett’s negligence claim. The jury awarded Duckett $8.5 million in damages. The trial court entered a judgment consistent with that verdict. We reverse the trial court’s judgment and remand the case for a new trial.
 

 Facts and Procedural History
 

 The accident at issue in this case occurred on Interstate 20 in Douglasville, Georgia. Patricia Simon, who was driving the Mountaineer, swerved to her left, allegedly to avoid another vehicle that was merging into Simon’s lane. According to Duckett’s accident-reconstruction expert, the Mountaineer traveled across at least one lane of traffic and partially entered the rumble strips on the shoulder of the highway before Simon turned the steering wheel sharply to her right, sending the Mountaineer into a 92-foot clockwise yaw.
 
 [1]
 
 The Mountaineer eventually began to roll over at a speed close to 58 miles per hour.
 
 [2]
 
 The vehicle rolled several times, finally coming to a stop on its roof.
 

 As the Mountaineer was rolling, Duck-ett, who was in the backseat, was ejected from the Mountaineer onto the ground. The vehicle rolled over her right leg and her left foot, causing severe injuries. Duckett’s right leg was subsequently am
 
 *1179
 
 putated above the knee. Duckett argues that she suffered other serious injuries from the accident, including
 

 “a fracture to her left arm which required surgery to stabilize the injury, and now, her left arm hangs uselessly at her side. She broke her left ankle and fractured her cervical spine and her ribs. Her left lung was collapsed. Her skin was ripped off her leg. Between her leg and arm injuries, Ms. Duckett has a 65% impairment to her whole person.
 

 “Ms. Duckett fractured her skull and severely and permanently damaged her brain. She was in a coma for twelve days after the accident. For three to eight months after the incident, she suffered from post-traumatic amnesia. Ms. Duckett sustained permanent cognitive impairment. Both her long and short term memory are severely impaired. Her speech is also impaired.”
 

 Duckett’s brief, at 10-11.
 

 In August 2005, Duckett sued Ford in the Etowah Circuit Court. Pursuant to the doctrine of
 
 lex loci
 
 delicti,
 
 [3]
 
 she alleged negligence and strict-liability claims under Georgia law based on an alleged design defect in the Mountaineer.
 

 On the first day of trial, the trial judge stated that “the trial ... could take anywhere from two to four weeks” and that he was “going to go down and talk to the jurors to make sure that we have jurors that can stay that long. And then we’re going to bring ... about thirty-five to forty jurors up here with the understanding that they can stay at least three weeks.” Counsel for Ford objected, arguing:
 

 “I believe
 
 we are entitled to a random selection of jurors from the entire veni-re.
 
 The idea that we can only strike from persons who have that much free time is, in my opinion, prejudicial to the defendant. We will get people who are unemployed, housewives, and otherwise have more time on their hands than the average juror might, and I don’t think that is fair to the defendant.”
 

 (Emphasis added.) The trial court acknowledged Ford’s objection and stated for the record that “no one on behalf of the plaintiff or defendant has agreed to anything in regard to how this Court is going to strike the jury.... That is the Court.” The following exchange occurred shortly thereafter:
 

 “MR. SCHUCK [counsel for Ford]: Can we come down and just observe the process?
 

 “THE COURT: Yes.
 

 “MR. SCHUCK: ... [I]s there a standard by which the Court is going to apply for people not getting on there?
 

 “In other words, if somebody says well, you know, I’ve got this excuse, are you going to hear any of that or is it strictly a matter of taking volunteers and show of hands?
 

 “THE COURT: Depends if I get enough.
 

 
 *1180
 
 “MR. SCHUCK: Okay.
 

 “THE COURT: And if I don’t get enough, we’ll bring a reporter down there and we’ll start putting stuff on the record about that. It just depends.
 

 “MR. SCHUCK: But if you get enough volunteers, it will just be a volunteer basis?
 

 “THE COURT: Yes. But, certainly, if I only get twenty — We’ve got to have, in my opinion, at least thirty-two. Preferably, I’d like to have forty. But I’ll have to — No. If we get to a situation where we do not have enough, then the Court will put that on the record.”
 

 According to an affidavit from Duckett’s counsel, the trial court then
 

 “addressed the full group of prospective jurors and explained nothing of the details of the case, but only told them that the case could take three or four weeks to try (in fact, this case took longer than four weeks to try to verdict). I do not recall the Court telling the prospective jurors that this was a ‘big case’ or a case ‘bigger’ than most in Etowah County. Nor do I recall the Court using the word ‘volunteers’ when addressing the prospective jurors. The Court asked that jurors who were able to serve on a case that lasted for that period of time raise their hands.
 

 “6. A group of jurors raised their hands and the clerk was charged with taking their names so they could be brought up to the courtroom for further jury selection.
 

 “7. This group of jurors was later brought into the courtroom for further jury selection.
 

 “8. No further questions were asked of this group of potential jurors concerning hardship.
 

 “9. A jury was selected from this group that was brought up into the courtroom.”
 

 The case proceeded to trial. Ford moved the trial court for a judgment as a matter of law at the close of Duckett’s case-in-chief and again at the close of all the evidence. The trial court denied those motions. The jury ultimately returned a verdict in favor of Duckett on her strict-liability claim, finding that Ford had placed the Mountaineer on the market with a defective design. On the other hand, the jury returned a verdict in Ford’s favor on Duckett’s negligence claim, finding that Ford had not been negligent in designing the Mountaineer. The jury awarded Duckett $8.5 million in compensatory damages, including $1,521,410 in economic damages. The remaining damages were awarded for pain and suffering. The trial court entered a judgment consistent with the verdict.
 

 Ford renewed its motion for a judgment as a matter of law and, alternatively, sought a new trial or a remittitur. After a hearing, the trial court denied the motion, and Ford appealed. That appeal was assigned case no. 1090833. Subsequently, the trial court awarded Duckett $54,865.76 in costs. Ford then filed another notice of appeal, and that appeal was assigned case no. 1091043. This Court consolidated the appeals for the purpose of writing one opinion.
 

 Issues
 

 Ford argues, among other things, that it is entitled to a new trial on the ground that the trial court violated the statutory requirement of random jury selection by asking for volunteers to serve on the jury. Because our resolution of this issue is dis-positive, we do not reach the other issues
 
 *1181
 
 raised by Ford in its appellate brief.
 
 [4]
 

 Standard of Review
 

 “With regard to review of a trial court’s ruling on a motion for a new trial, this Court has stated:
 

 “ ‘ “It is well established that a ruling on a motion for a new trial rests within the sound discretion of the trial judge. The exercise of that discretion carries with it a presumption of correctness, which will not be disturbed by this Court unless some legal right is abused and the record plainly and palpably shows the trial judge to be in error.” ’ ”
 

 Cottrell v. National Collegiate Athletic Ass’n,
 
 975 So.2d 306, 332 (Ala.2007) (quoting
 
 Curtis v. Faulkner Univ.,
 
 575 So.2d 1064, 1066 (Ala.1991), quoting in turn
 
 Kane v. Edward J. Woerner & Sons, Inc.,
 
 543 So.2d 693, 694 (Ala.1989)).
 

 Analysis
 

 Section 12-16-55, Ala.Code 1975, provides, in pertinent part, that “[i]t is the policy of this state that all persons selected for jury service be selected at random from a fair cross section of the population of the area served by the court.” It is undisputed that the original jury pool in this case was randomly selected in accordance "with this statute. However, the trial court reduced the original jury pool by asking for a show of hands of those jurors who could serve on a jury in a case that might last three to four weeks. Ford argues that, “[b]y asking jurors to volunteer for service in this case, the trial court violated the statutory requirement that the jury be selected at random, and improperly introduced a subjective criterion for jury service not authorized by statute.” Ford’s brief, at 28.
 

 There does not appear to be any Alabama caselaw directly on point.
 
 [5]
 
 However, Ford cites two federal cases that have addressed this issue:
 
 United States v. Kennedy,
 
 548 F.2d 608 (5th Cir.1977), overruled on other grounds by
 
 United States v. Singleterry,
 
 683 F.2d 122 (5th Cir.1982); and
 
 United States v. Brans
 
 
 *1182
 

 come,
 
 682 F.2d 484 (4th Cir.1982). In
 
 Kennedy,
 
 the United States Court of Appeals for the Fifth Circuit addressed whether allowing volunteer jurors to serve on a jury violates the random-selection requirement of the Jury Selection and Service Act of 1968, 28 U.S.C. §§ 1861-1869 (“the Jury Selection Act”). The procedural history of
 
 Kennedy
 
 is as follows:
 

 “On June 11, 1975, [Z.T. Kennedy] was brought to trial ... on both the robbery charge involved in this appeal and a charge of making a false statement regarding [his] prior criminal record while purchasing a firearm. On [Kennedy’s] motion the judge granted a mistrial to allow severance of the two counts. Trial on the bank robbery charge commenced ... on July 9, 1975. That trial resulted in the guilty verdict from which this appeal is taken.
 

 “Among the prospective jurors for the second trial were several who had served as jurors at the prior term of the district court, during which [Kennedy’s] abortive first trial had taken place. In order to satisfy a deficiency in the number of July prospects available from the qualified jury wheel, the jury clerk, pursuant to standing authorization from the chief judge of the district, had sought volunteers from the list of persons serving during the June term just completed.
 

 “No one has provided us any indication how the jury clerk selected from the list of names of prospective volunteers. Once she selected a name, however, the jury clerk’s practice was the following, as best discerned from the record: she contacted the former jurors by telephone and asked them if they would perform additional service. She made clear that such service was not mandatory, that she was simply seeking volunteers. She told the volunteers when to report to court; they were not subpoenaed.”
 

 Kennedy,
 
 548 F.2d at 609-10 (footnote omitted).
 

 Three of the volunteers were on the panel from which Kennedy’s jury would be selected. Kennedy’s counsel objected to their presence, arguing that their presence violated the random-selection rule. The district court overruled that objection, stating:
 

 “ ‘The court believes that they were randomly selected by reason of their prior summons for service in June and the court does not believe at this time that the service for an extra period of time by jurors who are willing to do so constitutes a violation of the requirement that jurors are to be randomly selected....’”
 

 Kennedy,
 
 548 F.2d at 610. The three volunteer jurors served on the jury that returned the guilty verdict against Kennedy.
 

 Section 1866(f) of the Jury Selection Act “authorize[s] a court to deal with ... unanticipated shortages of petit jurors drawn from the qualified jury wheel,”
 
 Kennedy,
 
 548 F.2d at 611, by selecting individuals “ ‘at random from the voter registration lists, lists of actual voters, or other lists specified in the plan, in a manner ordered by the court consistent with [the Jury Selection Act].”’
 
 Id.
 
 (quoting 28 U.S.C. § 1866(f)). The Fifth Circuit stated:
 

 “It is on § 1866(f) that the Government must and does rest its argument that the employment of volunteers to meet a shortage was not a violation of the [Jury Selection] Act. Even this argument, however, proves inadequate.
 

 “Even assuming that the list of last month’s jurors was an acceptable list
 
 *1183
 
 from which to select emergency jurors under § 1866(f), we would still confront the telling contradiction between the use of volunteers and the random selection mandated as explicitly by the emergency provision as by the remainder of the [Jury Selection] Act. Whatever list a court uses as the source of emergency jurors, § 1866(f) requires random selection from that list. It seems self-evident that allowing people to decide whether they wish to perform a particular task is quite the opposite of randomly selecting those who, unless within narrow and objectively determined categories of exemptions and excuses, must perform the task. A volunteer is not a random selec-tee.”
 

 Kennedy,
 
 548 F.2d at 611 (footnotes omitted).
 

 The Fifth Circuit then addressed whether the district court’s failure to comply with the Jury Selection Act was a “ ‘substantial,’ sufficient ground” on which to dismiss the indictment.
 
 Kennedy,
 
 548 F.2d at 611. The Fifth Circuit stated:
 

 “Otherwise technical violations of the statute constitute ‘substantial failure to comply1 when they affect the random nature or objectivity of the selection process.
 

 “That the introduction of personal predilections of prospective jurors affects the random nature of the selection process cannot be gainsaid....
 

 “We need not speculate as to what sort of biases will be reflected in a jury chosen on the basis of its members’ willingness to depart from their daily business and serve as jurors. It is enough to recognize that
 
 a substantial variable, not contemplated by the [Jury Selection] Act’s few, narrow categories of qualifications, exemptions, and excuses, has confounded the selection process.”
 

 Kennedy,
 
 548 F.2d at 612 (emphasis added). The Fifth Circuit concluded that “[providing prospective jurors with complete discretion whether or not to serve negates the statutory mandate of random selection. The practice of the district court amounted to a ‘substantial failure to comply" with the [Jury Selection] Act.”
 
 Kennedy,
 
 548 F.2d at 612.
 

 In
 
 Branscome,
 
 the United States Court of Appeals for the Fourth Circuit addressed whether allowing volunteers to serve on a grand jury violates the random-selection requirement of the Jury Selection Act. In that case, the district court had dismissed two indictments returned by a grand jury that included individuals who had been asked to “volunteer[ ] to serve on the grand jury from the pool of prospective jurors who had been randomly selected.”
 
 Branscome,
 
 682 F.2d at 485. The Fourth Circuit affirmed the district court’s judgment, stating “that (1) selection of volunteers introduces a subjective criterion for grand jury service not authorized by the [Jury Selection] Act, and (2) the selection of volunteers results in a non-random selection process in violation of the Congressional intent that random selection be preserved throughout the entire selection process.”
 
 Id.
 

 We find the rationales in
 
 Kennedy
 
 and
 
 Branscome
 
 persuasive in this case.
 
 [6]
 
 
 *1184
 
 Like the Jury Selection Act, § 12-16-55, Ala.Code 1975, requires the random selection of jurors. Here, the trial court’s request for a show of hands by those members of the jury pool who could sit on a case that might last three or four weeks was, in essence, a request for volunteers. The trial court acknowledged this when Ford’s counsel asked the trial court whether the court was going to hear any excuses from the members of the jury pool or whether it was “strictly a matter of taking volunteers and show of hands.” The trial court responded, “Depends if I get enough.” Ford’s counsel then asked: “But if you get enough volunteers, it will just be a voluntary basis?” The trial court responded, “Yes.”
 

 Also, one of the potential jurors indicated during voir dire that she had understood the trial court’s request for a show of hands to be a request for volunteers to serve on the jury. The potential juror, expressing some reservations about serving on the jury, stated: “Again, I just don’t really feel like that I can do this. And you know, again about the teaching— I really didn’t think that through when I volunteered yesterday.”
 

 As the Fifth Circuit noted in
 
 Kennedy,
 
 “allowing people to decide whether they wish to perform a particular task is quite the opposite of randomly selecting those who, unless within narrow and objectively determined categories of exemptions and excuses, must perform the task. A volunteer is not a random selectee.”
 
 Kennedy,
 
 548 F.2d at 611.
 

 Moreover, as was the case in
 
 Kennedy,
 
 the manner in which the trial court asked for volunteers introduced into the jury-selection process “a substantial variable, not contemplated by the [Alabama jury statutes’] few, narrow categories of qualifications, exemptions, and excuses.” 548 F.2d at 612. Section 12-16-60(a), Ala. Code 1975, provides the qualifications for jury service:
 

 “(a) A prospective juror is qualified to serve on a jury if the juror is generally reputed to be honest and intelligent and is esteemed in the community for integrity, good character and sound judgment and also:
 

 “(1) Is a citizen of the United States, has been a resident of the country for more than 12 months and is over the age of 19 years;
 

 “(2) Is able to read, speak, understand and follow instructions given by a judge in the English language;
 

 “(3) Is capable by reason of physical and mental ability to render satisfactory jury service, and is not afflicted with any permanent disease or physical weakness whereby the juror is unfit to discharge the duties of a juror;
 

 “(4) Has not lost the right to vote by conviction for any offense involving moral turpitude.”
 

 Section 12 — 16—63(b), Ala.Code 1975, which sets forth the reasons for which a potential juror may be excused from jury service, provides, in pertinent part:
 

 “(b) A person who is not disqualified for jury service may apply to be excused from jury service by the court only upon
 
 *1185
 
 a showing of undue or extreme physical or financial hardship, a mental or physical condition that incapacitates the person, or public necessity....
 

 [[Image here]]
 

 “(2) For purposes of this article, undue or extreme physical or financial hardship is limited to any of the following circumstances in which an individual would:
 

 “a. Be required to abandon a person under his or her personal care or supervision due to the impossibility of obtaining an appropriate substitute caregiver during the period of participation in the jury pool or on the jury.
 

 “b. Incur costs that would have a substantial adverse impact on the payment of the individual’s necessary daily living expenses or those for whom he or she provides the principal means of support.
 

 “c. Suffer physical hardship that would result in illness or disease.”
 

 None of these statutory provisions permits juror self-selection based upon the juror’s willingness to serve over an extended period of time. Indeed, only judges and other properly designated court officials have the authority to excuse jurors. See
 
 Windsor v. State,
 
 688 So.2d 1021, 1026 (Ala.1994) (noting that § 12-16-145, Ala. Code 1975, “specifically provides that the presiding judge may delegate to other court officials the judge’s authority to excuse jurors”). Therefore, we agree that the use of volunteer jurors “introduces a subjective criterion for ... service not authorized by the [Alabama jury statutes],”
 
 Branscome,
 
 682 F.2d at 485, and “introduces a significant element of nonrandomi-zation into the selection process that not only technically violates, but substantially departs from, [§ 12-16-55’s] requirements.”
 
 Kennedy,
 
 548 F.2d at 610.
 

 Duckett argues that “[t]he Alabama Code is clear that for Ford to prevail on a claim that the jury venire was not chosen randomly, Ford has the burden of proving fraud in the drawing or summoning of jurors.” Duckett’s brief, at 32. Section 12-16-80, Ala.Code 1975, provides that “[n]o objection can be taken to any venire of jurors except for fraud in drawing or summoning the jurors.” Duckett argues that “[t]here is no proof of fraud in the selection process” in this case and, thus, that Ford cannot object to the composition of the jury. Duckett’s brief, at 37.
 

 This Court has stated:
 

 “The purpose of [§ 12-16-80] is to accomplish the salut[a]ry purpose of preventing the quashing of venires for mere irregularities and to obviate the resulting delays in the administration of justice. The ‘irregularities’ spoken of refer to trivial administrative errors. They do not refer to such radical departures from the statutory scheme as to constitute usurpation of legislative authority.
 

 “The activating word ‘fraud’ as used in the statute, has been construed as encompassing more than criminal wiles; instead, it is a relative term which ‘includes all acts and omissions which involve a breach of legal duty injurious to others.’ Thus, a legal fraud is all that is required by the statute for a venire to be quashed.
 

 “The jury statutes, as to each precise provision, are not themselves mandatory; substantial compliance with them is required.... ”
 

 Kittle v. State,
 
 362 So.2d 1271, 1273-74 (Ala.1978) (citations and footnote omitted).
 

 
 *1186
 
 As noted previously, the trial court’s request for volunteers was a violation of § 12-16-55 that affected Ford’s right to a randomly selected jury. As the Fifth Circuit noted in
 
 Kennedy,
 
 “[a] departure from the statutory scheme that directly affects the random nature of selection establishes a
 
 substantial violation
 
 independently of the departure’s consequences in a particular case.”
 
 Kennedy,
 
 548 F.2d at 612 (emphasis added). Thus, the trial court’s act was more than a “mere irregularit[y]” or a “trivial administrative error.”
 
 Kittle,
 
 362 So.2d at 1273. It was a substantial violation of the random-selection requirement of § 12-16-55, a requirement that the legislature has declared to be “the policy of this state.” Section 12-16-80 does not prevent Ford from insisting upon its right to a randomly selected jury.
 

 For these reasons, we reverse the trial court’s judgment and remand the case for a new trial. Because we are reversing the trial court’s judgment and remanding for a new trial, we must also reverse its order awarding court costs to Duckett.
 

 1090833 — REVERSED AND REMANDED.
 

 1091043 — REVERSED AND REMANDED.
 

 COBB, C.J., and BOLIN, MURDOCK, and MAIN, JJ., concur.
 

 [1]
 

 . "Yaw” has been defined as "the action of yawing,” i.e., "turn[ing] by angular motion about a vertical axis.”
 
 Metriam-Webster’s Collegiate Dictionary
 
 1461 (11th ed.2003).
 

 [2]
 

 . There is some dispute as to whether the rollover was triggered by a wheel rim gouging the pavement during the yaw or, instead, was the result of Simon's avoidance maneuvers. This issue is not relevant to our resolution of the appeal, and we need not address this dispute.
 

 [3]
 

 . Under the doctrine of
 
 lex loci delicti,
 
 a court " ‘determinefs] the substantive rights of an injured party according to the law of the state where the injury occurred.’ ... Although
 
 lex loci delicti
 
 governs substantive law,
 
 lex
 
 fori— the law of the forum — governs procedural matters.”
 
 Middleton v. Caterpillar Indus., Inc.,
 
 979 So.2d 53, 57 (Ala.2007) (quoting
 
 Fitts v. Minnesota Mining & Mfg. Co.,
 
 581 So.2d 819, 820 (Ala.1991)). The accident in this case occurred in Georgia. Therefore, Georgia law governs Duckett’s substantive legal rights.
 

 [4]
 

 . Ford also argues (1) that it is entitled to a judgment as a matter of law or, in the alternative, a new trial because, it argues, the jury’s verdict is irreconcilably inconsistent under Georgia law; (2) that it is entitled to a new trial because the trial court exceeded its discretion in allowing allegedly improper evidence; (3) that it is entitled to a new trial or a remittitur of the damages award because, Ford argues, the trial court made the award of damages for pain and suffering dependant upon a finding of willful or wanton misconduct and the jury made no such finding; (4) that it is entitled to a new trial or a remittitur because, it says, the damages award is excessive and was the result of inflammatory arguments by Duckett’s counsel; and (5) that the court costs awarded are excessive.
 

 [5]
 

 . Duckett argues that
 

 "Ford has failed to meet its burden of proving any element of its claim — that it suffered any prejudice as a result of the jury selection process; that the jury panel was not randomly selected; that there was a systematic exclusion of a specific group of people; or that fraud was somehow involved. Absent any such proof, Ford is left only with its unsupported complaints which, under the law of Alabama, are inadequate to support an order for a new trial.”
 

 Duckett’s brief, at 31. She cites a few Alabama cases in support of this argument. However, none of the cited cases addresses the issue of volunteer jurors or the random-selection requirement of § 12-16-55. Instead, they set forth the proof required to prevail on a claim alleging that the jury does not represent a fair cross section of the community, as required by § 12-16-55. Ford does not argue that the jury in this case did not represent a fair cross section of the community. Therefore, the cited cases are inap-posite, and Duckett's reliance on them is misplaced.
 

 [6]
 

 . Duckett attempts to distinguish
 
 Kennedy
 
 and
 
 Branscome
 
 by arguing that the alleged error in those cases occurred during an earlier stage of the jury-selection process than did the alleged error in this case. However, this is a distinction without a difference. The random-selection requirement of § 12-16-55, Ala.Code 1975, must necessarily apply to all
 
 *1184
 
 stages of the jury-selection process. A request for volunteers, whether it occurs earlier or later in the process, affects the random nature of the jury. As the Fifth Circuit stated in
 
 Kennedy:
 
 "Nonrandom selection of a subgroup from a randomly selected group does not make for a randomly selected subgroup. Former purity cannot randomize what has become unrandom.” 548 F.2d at 612.